**ABF CAPITAL MANAGEMENT,**
**et al., Plaintiffs,**

v.

**ASKIN CAPITAL MANAGEMENT, L.P., Kidder, Peabody & Co., Inc., Bear Stearns & Co., Inc. and Donaldson, Lufkin & Jenrette Securities Corp., Defendants.**

No. 96 Civ. 2578 (RWS).

United States District Court,
S.D. New York.

Jan. 24, 1997.

1310

Berlack, Israels & Liberman, New York City (Steven E. Greenbaum, John P. Biedermann, Anne M. Cunningham, Robert J. Stark, of counsel), for Plaintiffs.

Shereff, Friedman, Hoffman & Goodman, New York City (Andrew J. Levander, Shari L. Steinberg, David S. Hoffner, of counsel), for Askin Capital Management.

Cleary, Gottlieb, Steen & Hamilton, New York City (Thomas J. Moloney, Mitchell A. Lowenthal, Robin A. Henry, Carmine D. Boccuzzi, Jr., of counsel), for Kidder, Peabody & Co., Inc.

Fried, Frank, Harris, Shriver & Jacobson, New York City (William McGuinness, David M. Morris, Douglas W. Henkin, of counsel), for Bear, Stearns & Co., Inc.

Morgan, Lewis & Bockius, New York City (Catherine A. Ludden, Gary G. Staab, Scott S. Balber, Maureen C. Weiss, of counsel), for Donaldson, Lufkin & Jenrette Securities.

*OPINION*

SWEET, District Judge.

In this action alleging violations of the Racketeer Influenced and Corrupt Organizations statute ("RICO") and state law fraud, breach of fiduciary duty, negligent misrepresentation and unjust enrichment claims, defendants Askin Capital Management, L.P. ("ACM"), Kidder Peabody & Co. Incorporated ("Kidder"), Bear, Stearns & Co. Inc. ("Bear Stearns"), and Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") (collectively, "Defendants") have moved, pursuant to Rule 12(b)(6) and Rule 9(b), Fed. R.Civ.P., to dismiss the complaint against them for lack of standing, failure to state a claim and failure to plead fraud with particularity.

For the reasons set forth below, Defendants' motions will be granted in part and denied in part.

*Parties*

The Plaintiffs are thirty-eight shareholders and/or limited partners in Granite Partners, L.P. ("Granite Partners"), a limited partnership registered in the State of Delaware, Granite Corporation ("Granite Corp."), incorporated in the Cayman Islands, and/or Quartz Hedge Funds ("Quartz"), also incorporated in the Cayman Islands (collectively, the "Funds"). Complaint ¶ 9. The Funds are not parties to this action. Among the Plaintiffs are retirement plans governed by ERISA, corporations, investment partnerships, and individuals. *Id.*

At all relevant times, Defendant ACM, a Delaware limited partnership with a principal place of business in New York, was a registered investment adviser. Non-party David J. Askin ("Askin") was the Chief Executive Officer of ACM. In January 1993, Askin formed ACM. Complaint ¶ 13. At that time, ACM became the investment advisor to Granite Partners and Granite Corp.; at all times thereafter, ACM was the sole general partner of Granite Partners and the invest-

ment advisor to each of the Funds. *Id.* at ¶¶ 13–14.

Kidder Peabody, Bear Stearns and DLJ (collectively, the "Brokers" or "Broker Defendants"), all Delaware Corporations with principal places of business in New York, are broker-dealers.

*Background*

**I. *Factual Allegations***

On a motion to dismiss under Rule 9(b) or Rule 12(b)(6), the facts alleged in the complaint are presumed to be true, and all factual inferences are drawn in the plaintiff's favor. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). Accordingly, the facts presented here are drawn from the allegations of Plaintiff's complaint (the "Complaint") and do not constitute findings of fact by the court.

This action arises from the collapse in early 1994 of three "hedge funds" managed by ACM: Granite Partners, Granite Corp. and Quartz (the "Funds"). Compl. ¶ 1. The Funds made leveraged investments in the volatile mortgage-backed securities market. *Id.* Each Plaintiff purchased an interest in one or more of the Funds; the earliest such transaction occurred in September 1990, and the latest occurred in March 1994. Compl. ¶ 9. Several of the Plaintiffs acquired additional interests in the Funds after their initial investment. *Id.* In the aggregate, Plaintiffs allege that they lost approximately $230 million that they invested in the Funds. *Id.* at ¶¶ 1, 9.

ACM (and, before ACM's creation, Askin) actively marketed interests in the Funds. In documents disseminated to each of the Plaintiffs, ACM described an investment strategy that purportedly could "achieve its investment objective of earning high absolute levels of return regardless of whether the bond market moves up, down or stays the same." *Id.* at ¶¶ 29, 30, 31, 35, 36. ACM targeted in particular investors who desired "low and manageable levels of risk," in part by promising that ACM would "meet[ ] its investment objectives without speculating on the future direction of interest rates." *Id.* at ¶¶ 31, 33, 36, 40. Rather, ACM promised to invest "in a balanced or hedged portfolio of CMOs [col-

lateralized mortgage obligations] ... with the security of high quality, low risk investments" that traded in an active market. *Id.* at ¶¶ 29, 34, 36. The ACM-created portfolios supposedly would be diversified and "hedged so as to maintain a relatively constant portfolio value, even through large interest rate swings." *Id.* at ¶¶ 29, 36. In a document used by ACM to solicit purchases of interests in the Funds, ACM made the following representations to the Plaintiffs:

> What is [the] risk exposure by investing in CMOs and their derivatives? Very little when investing through [ACM]. While the high yielding instruments in which we invest individually have market risk (*e.g.,* exposure to prepayment), when combined in a risk-balanced, market-neutral portfolio, these government and government agency guaranteed instruments (or Aaa and Aa rated) have low risk (*e.g.,* low volatility).

*Id.* at ¶ 37.

ACM also provided detailed descriptions of the methodology it would use to make investment decisions. For example, ACM stated that it would employ "its proprietary analytic models" to evaluate each security under consideration over a variety of prepayment and interest rate scenarios. *Id.* at ¶ 40. ACM represented that its investment analysis was not a one-time procedure, but an active and ongoing process "designed to assure that [ACM] can always have its portfolio structured with the most appropriate securities for achieving its investment goal." *Id.* at ¶ 38. Written materials disseminated by ACM set forth a "structured five-step process" of computer-driven quantitative analysis that would enable ACM to identify and acquire "high yield bonds that, when combined with other select CMOs, [would] form a hedged, lower-risk portfolio." *Id.* at ¶ 40.

ACM's written materials also spoke about leverage and liquidity. As to the latter, ACM represented that it would purchase securities that traded in active markets and otherwise insure that the Funds never would become "distressed" or "forced" sellers of securities, but would maintain at all times an ability to "wait it out until conditions improve." *Id.* at ¶¶ 34, 43. Although ACM made various representations about the specific leverage ratios it would maintain for each of the Funds, ACM was consistent in its promise to keep borrowings conservative. *Id.* at ¶ 44.

ACM and Askin allegedly issued these statements continuously from September 1991 to March 1994. The Plaintiffs, who invested their money through ACM throughout that period, each received and relied upon the allegedly fraudulent documents in purchasing and retaining their shares in the Funds. Compl. ¶¶ 21, 41.

The Complaint alleges that each of the above-referenced representations was false and that ACM knew that each was false at the time that the statements were issued. The securities primarily trafficked in by ACM did not have "low risk" and "low volatility." Rather, ACM purchased mass quantities of esoteric securities that it and the Brokers referred to as "toxic" or "nuclear waste." *Id.* at ¶¶ 47, 48, 50, 57, 58, 59, 65, 66, 67, 68, 69, 73, 74. Neither did ACM create market-neutral, diversified, balanced, or hedged portfolios. At all times, ACM maintained dramatically tilted portfolios that were uniquely susceptible to rises in interest rates. *Id.* at ¶¶ 46, 48, 67, 71, 72–76. ACM did not employ a formalized, five-step process of analysis utilizing proprietary, computerized analytical models; it did not have any models, and it traded based predominantly on Askin's "gut" feelings or in response to pressure from the Brokers. *Id.* at ¶¶ 103–108. ACM created a highly illiquid portfolio, thus putting the Funds at risk of becoming a "forced" seller, which ACM in fact became in 1994. *Id.* at ¶¶ 50, 119, 120. Finally, ACM did not keep the Funds' leverage within reasonable ranges; it borrowed excessively, and on atypical terms, from the Brokers, and engaged in massive forward transactions. *Id.* at ¶¶ 46, 51, 94–98, 109–20.

ACM (and Askin) allegedly steered the bulk of the Funds' business to the three defendant Brokers. Due in large part to their trading with ACM, the Brokers collectively garnered over 40% of the CMO market by early 1994. *Id.* at ¶¶ 53–54. At that time, moreover, approximately 65% of the securities in the Funds' portfolios had been created

and sold by the Brokers. *Id.* at ¶ 56. The Brokers made millions of dollars as a result of their dealings with ACM; in 1993, for example, the Brokers, in the aggregate, earned approximately $140 billion dollars from CMO offerings. *Id.* at ¶ 53. Largely as a result of trades with ACM, the Brokers enjoyed continually increasing shares of—and profits from—the lucrative CMO market. *Id.* at ¶ 54.

ACM was allegedly a vitally important customer of the Brokers. Using excessive leverage, ACM was able to employ the Plaintiffs' money to buy and sell billions of dollars worth of high-risk, volatile CMO securities during 1993 and 1994. *Id.* at ¶ 55. Most importantly, ACM was willing to purchase the most volatile tranches of any given CMO offering. This was allegedly crucial from the Brokers' perspective, as these tranches—also known as the "deal drivers"—had to be sold as a precondition to the pricing and selling of the remainder of each particular CMO offering and were the source of virtually all of the trading profit made by the Brokers on such offerings. *Id.* at ¶ 57. ACM's pronounced role in this market is evidenced by the allegations that the Brokers' issuance of CMOs dropped by approximately 90% after ACM's demise. *Id.* at ¶ 59.

Plaintiffs allege that the Brokers knew that ACM had promised to purchase only "high quality," "low risk," freely-tradeable securities for the Funds' portfolios and to hedge and balance those portfolios so that they were immune to changes in interest rates. *Id.* at ¶¶ 47, 67, 68, 69, 71, 72, 73, 74. The Brokers also allegedly knew that the securities they sold to ACM did not fit within the parameters of ACM's investment discretion and were inappropriate for the Funds. *Id.* at ¶¶ 47, 48, 67–75. Among other things, these securities were highly volatile and could not be modeled or hedged effectively. *Id.* at ¶¶ 50, 67–75, 96, 102, 105. Knowing that ACM had created dramatically bullish (*i.e.,* not neutral) portfolios, the Brokers allegedly continued to sell additional bullish securities to ACM. *Id.* at ¶¶ 48, 67–76, 77, 93, 102.

The Brokers knew that ACM did not possess the analytic models or other tools necessary to understand or hedge esoteric CMO securities. *Id.* at ¶¶ 49, 96, 105–08. Knowing this, the Brokers not only continued to sell such securities to the Funds, but also misrepresented to ACM the essential characteristics of a given security in order to convince ACM that the security would be appropriate for the portfolios. *Id.* at ¶¶ 49, 78, 93. The Brokers also were aware that ACM had promised to keep leverage low and liquidity high. *Id.* at ¶¶ 68, 72, 94–98, 112, 119, 120. In order to ensure that ACM had a continuing source of money with which to purchase their high-risk, deal-driving tranches, each of the Brokers extended unusually favorable borrowing terms to ACM and induced ACM to purchase securities for forward settlement, which the Brokers knew would result (and which did result) in ACM becoming over-leveraged and illiquid. *Id.* at ¶¶ 50, 51, 94–97, 112–18. These conditions, in turn, rendered the Funds unable to meet margin calls issued by each of the Brokers in March 1994. Complaint ¶¶ 131–41. The Brokers also allegedly helped ACM to report artificially-inflated performance results by providing inflated performance marks to ACM. Complaint ¶¶ 121–30. Plaintiffs concede that the specific marks set forth in paragraph 130 as examples of inflated marks are inaccurate. However, there are allegations, including excerpts from Broker telephone conversations, that indicate the Brokers "re-evaluated" their initial marks upward in negotiations with ACM. Complaint ¶ 127. These inflated marks were then allegedly passed on to Plaintiffs in monthly "flash" and "final" reports mailed to investors.

Plaintiffs also allege that the relationship between the Brokers and ACM was symbiotic in nature. Plaintiffs allege that a Kidder salesman who covered the ACM account stated: "We are in bed with [ACM]." Complaint ¶ 65. In the same conversation, Kidder's representative admitted: (1) Kidder's knowledge that the securities it sold to ACM were "nuclear waste"; and (2) that Kidder's salespeople could earn commissions from the sale of such "nuclear waste" to ACM that were as much as 128 times the amount that could be earned from selling less risky securities to ACM. *Id.*

In other recorded conversations, Kidder pointed out that DLJ had sold securities to ACM that could neither be hedged nor accurately valued. *Id.* at ¶ 69, 70. DLJ itself had informed ACM in September (and February) 1993 that the Funds' portfolios were not neutral and would decline in value if interest rates rose; yet, as the Brokers allegedly knew, ACM issued prospectuses and other marketing materials in September 1993 (and throughout that year) representing that the portfolios were neutral and immune from such increases in interest rates. *Id.* at ¶ 73.

## II. The Bankruptcy Proceedings and the Primavera Action

On or about April 8, 1994, the Funds filed petitions under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The bankruptcy proceedings are before the Honorable Stuart M. Bernstein. In September 1995, Primavera Familienstiftung ("Primavera"), a Liechtenstein foundation and alleged stockholder in Granite Corp., filed a purported class action complaint in this Court, styled *Primavera Familienstiftung v. Askin,* No. 95 Civ. 8905. The complaint in that action, as amended, named David Askin, ACM, Geoffrey Bradshaw-Mack, Kidder Peabody, Bear Stearns, and DLJ as defendants and asserted claims for, inter alia, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, common law fraud, negligent misrepresentation, breach of fiduciary obligations, third party beneficiary breach of contract, and violations of Article 9 of the New York Commercial Code. On December 21, 1995, the appointed trustee in bankruptcy, Harrison Goldin, sought a preliminary injunction to prevent Primavera from continuing to prosecute its action.

By Opinion dated April 9, 1996, the Bankruptcy Court granted in part and denied in part the trustee's motion. *In re Granite Partners, L.P.,* 194 B.R. 318 (Bankr.S.D.N.Y. 1996). Specifically, the Bankruptcy Court determined that Primavera's fraudulent inducement claims were direct and belonged to shareholders. *Id.* at 327. However, the Bankruptcy Court enjoined Primavera from prosecuting its breach of fiduciary duty claims on the ground that only the trustee had standing to sue insiders for injuries to a corporation or limited partnership arising from breach of fiduciary duty. *Id.* at 327–28.

This Court subsequently dismissed all of the claims in the second amended complaint in *Primavera,* granting plaintiff leave to replead the section 10(b) and fraud claims, which had been dismissed for failure to plead fraud with particularity, and to replead the breach of fiduciary duty claim at such time as the bankruptcy court's injunction was dissolved. *See Primavera Familienstiftung v. Askin,* 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996); *Primavera Familienstiftung v. Askin,* 1996 WL 580917 (S.D.N.Y. Oct. 9, 1996).

## III. Prior Proceedings In This Action

Plaintiffs originally filed this action in New York State Supreme Court on March 27, 1996. Defendants removed the case to this Court on April 24, 1996.

In their Complaint, Plaintiffs asserted seven claims: (1) common law fraud against ACM; (2) aiding and abetting fraud against the Broker Defendants; (3) breach of fiduciary duty against ACM; (4) aiding and abetting breach of fiduciary duty against the Broker Defendants; (5) negligent misrepresentation against ACM; (6) unjust enrichment against all defendants; and (7) violations of the RICO statute, 18 U.S.C. § 1962, against all defendants.

Defendants filed the instant motions on June 3, 1996. Oral argument was heard on September 24, 1996, at which time the motions were deemed fully submitted.

## Discussion

### I. Legal Standards

#### A. Rule 12(b)(6)

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989); *Hishon v.*

*King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

**B. Rule 9(b)**

█ Federal Rule of Civil Procedure 9(b) requires that in all allegations of fraud, the circumstances constituting the fraud must be stated with particularity. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127 (2d Cir.1994); *In re Time Warner, Inc. Secs. Litig.,* 9 F.3d 259, 265 (2d Cir.1993); *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 444–45 (2d Cir.1971). The pleading must be sufficiently particular to serve the three goals of Rule 9(b) which are (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to his reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. *See DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276, 279 (S.D.N.Y.1990), *aff'd,* 936 F.2d 674 (2d Cir. 1991).

The Court of Appeals has required that allegations of fraud adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir. 1992); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989).

█ The pleading must give notice to each opposing party of its alleged misconduct. Thus, a claim may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged. *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 n. 7 (S.D.N.Y. 1977). This requirement facilitates the preparation of an adequate defense while protecting a party's reputation from groundless accusations. *See de Atucha v. Hunt,* 128

F.R.D. 187, 189 (S.D.N.Y.1989), *aff'd,* 979 F.2d 846 (2d Cir.1992); *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir.1982). It also serves to prevent abuse of process and gratuitous disruption of normal business activity. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975).

█ Not all elements of a fraud claim need be pleaded with equal particularity. Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See Shields,* 25 F.3d at 1128. The Court of Appeals has held that "allegations of scienter … are not subjected to the more exacting consideration applied to the other components of fraud." *Breard v. Sachnoff & Weaver, Ltd.,* 941 F.2d 142, 143 (2d Cir.1991) (quoting *Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1991)). All that is required under Rule 9(b) is that there exist a "minimal factual basis for … conclusory allegations of scienter." *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (quoting *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)). "In fact, conclusory allegations of scienter are sufficient 'if supported by facts giving rise to a "strong inference" of fraudulent intent.'" *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993) (quoting *Ouaknine,* 897 F.2d at 80). There are two methods of pleading that may give rise to such an inference. A plaintiff may either (1) identify circumstances indicating conscious or reckless behavior by the defendants, or (2) allege facts showing both a motive for committing fraud and a clear opportunity for doing so. *Shields,* 25 F.3d at 1128; *Cosmas,* 886 F.2d at 13.

**II. The RICO Claim Will Be Dismissed**

Plaintiffs assert as their Seventh Claim for Relief that the Dealers and ACM participated in a fraudulent RICO scheme. Plaintiffs allege:

> [Defendants] collectively induced the Investors to invest over $225 million in the Funds by disseminating to the Investors false descriptions of ACM's investment ob-

jectives and strategies, false descriptions of the securities to be purchased by ACM for the Funds, false descriptions of ACM's ability to analyze and monitor such securities, false and inflated reports concerning the performance of the Funds, false statements regarding the Funds' use of leverage, false descriptions of the market in which the Funds would invest, and false accounts of the reason for the Funds' collapse.

Complaint ¶ 179.

As part of the 1995 Private Securities Litigation Reform Act (the "Reform Act"), Congress amended RICO to remove securities fraud claims as RICO predicate acts. Section 1964(c) of Title 18, United States Code, now provides that:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ... *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of Section 1962.*

18 U.S.C. § 1964(c) (emphasis added). The Reform Act became effective on December 22, 1995, three months before the filing of the instant case on March 27, 1996.

In amending the RICO statute, Congress made clear its intent to prevent the invocation of RICO in ordinary fraud cases, which were beyond the original purpose of the law. The Reform Act's legislative history is unequivocal in stating that where allegations of mail and wire fraud derive from conduct otherwise actionable as securities fraud, no RICO claim will lie:

> The Committee amends Section 1964(c) of Title 18 of the U.S.Code to remove any conduct that would have been actionable as fraud in the purchase or sale of securities as a predicate act of racketeering under civil RICO. The Committee intends this amendment to eliminate securities fraud as a predicate act of racketeering in a civil RICO action. In addition, a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts of racketeering under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.

S.Rep. No. 98, 104th Cong., 1st Sess. (June 19, 1995), [1995 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 85,629, at 86,767; *see also* H.R.Rep. No. 369, 104th Cong., 1st Sess. at 47 (Nov. 28, 1995) ("[T]he Conference Committee intends that a plaintiff may not plead other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."). The Reform Act makes clear that "Congress intended to capture claims of wire and mail fraud in connection with [the] purchase or sale of securities as well." *District 65 Retirement Trust v. Prudential Sec., Inc.,* 925 F.Supp. 1551, 1567 (N.D.Ga.1996).

■■■ Thus, Plaintiffs' allegation that they were induced to purchase the securities issued by the Funds is barred under the recent amendments to the RICO statute. Plaintiffs' allegations that ACM fraudulently induced them not to sell is similarly barred, since the RICO amendments prohibit the bringing as a RICO claim of any conduct actionable as fraud in the purchase *or sale* of securities.

Plaintiffs do not contest that application of the Reform Act to this case would mandate dismissal of the RICO claims alleged in the Complaint. Instead, they contend that the Reform Act, passed by Congress months before the filing of this Complaint, should not be applied here because it would constitute an impermissible retroactive application of the statute.

■■■ Generally speaking, "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice...." *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). However, Plaintiffs contend that the Reform Act should not apply to cases filed after its enactment where the underlying conduct pre-dates the change in the statute because such an application would constitute an impermissible retroactive deprivation of their rights. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1944).

A threshold issue is whether the Reform Act is intended to apply to all cases (such as this one) brought after its passage, or only to the subset of those cases that are based on conduct occurring after its passage. Since RICO has a four-year limitations period, the latter interpretation would mean that the Reform Act would not halt the perceived abuses of RICO it was designed to redress until nearly the next century. *See Buitrago–Cuesta v. I.N.S.,* 7 F.3d 291, 294 (2d Cir.1993) (applying changes in Immigration Law to past conduct because "[i]f § 511 does not apply to aliens convicted of aggravated felonies prior to 1990, its directive would not affect any action by the Attorney General until 1995, five years from the date of the 1990 Act's enactment.").

■ Under *Landgraf,* a court begins its analysis in determining whether a change in the law is to apply to a pending case by looking to the text of the statute. *Landgraf,* 511 U.S. at 257, 114 S.Ct. at 1492–93. The text of the Reform Act does not, on its face, evince any Congressional intent to withhold application of the law from cases where the allegedly fraudulent conduct took place prior to enactment, but the suit is brought after enactment. The limitation to section 1964(c) added by the Reform Act, which provides that "no person may rely" on securities fraud to "establish a violation of Section 1962," is not limited in time. The statute is not limited to future conduct, and its prohibition is absolute: no person may rely on securities fraud to make out a RICO claim.[1]

The legislative history of the Reform Act, which *Landgraf* instructs courts to examine in this context, *see* 511 U.S. at 262, 114 S.Ct. at 1495–96, similarly evidences an intent that the statute be uniformly applied to cases brought after its enactment. *See* H.R.Rep. No. 369, 104th Cong., 1st Sess. at 47 (Nov. 28, 1995) (reporting intent of Conference Committee that a plaintiff "may not plead" securities fraud as a RICO predicate act); H.R.Rep. No. 42, 104th Cong., 1st Sess. at 2774 (Representative McCullum stating that the Reform Act would "put an *immediate* stop to one of the greatest abuses of the civil RICO statute") (emphasis added); H.R.Rep. No. 42, 104th Cong., 1st Sess. at 2773 (Representative Conyers notes that "[w]e now have a measure in one sentence that will remove [RICO] from all securities litigation *from this point on*") (emphasis added).

■ Moreover, even if the statutory language and the legislative history are not dispositive, the application of the Reform Act to this case would not constitute a "retroactive" application of the statute within the meaning of *Landgraf.* In *Landgraf,* the Court explicitly stated that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based on prior law." *Landgraf,* 511 U.S. at 269, 114 S.Ct. at 1499 (citation omitted). The Court held that a statute has "retroactive effect" only in the limited circumstances where it: (1) impairs rights a party possessed when he acted; (2) increases a party's liability for past conduct; or (3) imposes new duties with respect to completed transactions. *Id.* at 280, 114 S.Ct. at 1505. There is no dispute that the elimination of RICO liability premised on fraud in the purchase or sale of securities does not fall within the second or third prong of the *Landgraf* test. Rather, Plaintiffs contend that application of the statute implicates the "vested rights" prong of the *Landgraf* test.

■ Plaintiffs assert that application of the Reform Act would impair "rights" they possessed when they acted. However, it has long been recognized that "no person has a vested right in any general rule of law or policy of legislation entitling him to insist that it remain unchanged for his benefit." *Chicago & Alton R.R. v. Tranbarger,* 238 U.S. 67, 76, 35 S.Ct. 678, 681, 59 L.Ed. 1204 (1915). A cause of action that has not been reduced to a final judgment is not a "vested

---

1. Moreover, section 108 of the Reform Act states that "[t]he amendments made by this title shall not affect or apply to any private action arising under Title I of the Securities Exchange Act of 1934 or Title I of the Securities act of 1933, commenced before and pending on the date of

enactment of this Act." Although this provision does not apply directly to the RICO amendments, it does support the conclusion that Congress intended its reforms to apply to all actions brought after passage of the Act.

right." *Hyundai Merchant Marine Co. v. United States,* 888 F.Supp. 543, 551 (S.D.N.Y.1995) ("A cause of action ... is inchoate and affords no definite or enforceable property right until reduced to final judgment.") (quotation omitted), *aff'd,* 75 F.3d 134 (2d Cir.1996). *See also Vernon v. Cassadaga Valley Cent Sch. Dist.,* 49 F.3d 886, 889 (2d Cir.1995) (applying changed limitations provision to dismiss suit filed subsequent to change, although underlying conduct predated new law). Application of the statute in the circumstances of this case is thus not retroactive. *See In re Industrial Freight System, Inc.,* 191 B.R. 825, 828–29 (C.D.Cal.1996) (Title VI of Federal Aviation Administration Act of 1994 barred claim filed after its effective date, despite fact that underlying transaction took place prior to effective date).

Plaintiffs cite *Miller v. CBC Cos.,* 908 F.Supp. 1054, 1064 (D.N.H.1995), in which the court refused to apply the Americans with Disabilities Act to conduct that predated the law. That case and others cited by Plaintiffs, however, fall into the category of cases where courts refuse to impose on defendants duties that did not exist at the time they acted. Here, by contrast, no new duties are being imposed on Plaintiffs.

Although Plaintiffs contend that application of the Reform Act would be unjust here, Plaintiffs cannot claim they were unaware before passage of the Reform Act of the facts that they now allege give rise to a RICO claim. Plaintiffs have had access to the documents of the bankruptcy trustee for well over a year. Moreover, if plaintiffs here can sufficiently plead a claim against ACM for common law fraud or against the Brokers for aiding and abetting that fraud, a non-RICO remedy exists on those claims. The Reform Act does nothing to impair that cause of action. Thus, Plaintiffs' argument is not that they have an interest in any substantive liability imposed solely by the RICO statute, but rather that they have a right to the treble damages provision embodied in the RICO statute.

Plaintiffs cite no case, and this Court has found none, holding that the elimination of a previously available remedy should not be applied to later-filed cases because the conduct complained of occurred prior to the change in the law. Indeed, the law is to the contrary. *See Gonsalves v. Flynn,* 981 F.2d 45, 49 (1st Cir.1992) (rejecting plaintiff's challenge to application of amendment to statute of limitations, because the "tolling amendment is being applied prospectively to a suit filed after its enactment"). Indeed, "[n]othing in *Landgraf* implies that a vested right occurs immediately upon a party's conduct"; ... a cause of action is not necessarily even a "vested right." *In re Industrial Freight Sys., Inc.,* 191 B.R. at 829 n. 7 (Bankr. C.D.Cal.1996) (citation omitted).

The two RICO cases which plaintiffs cite are inapposite. Since both involved lawsuits filed before December 22, 1995, the date of the enactment of the RICO amendment, the issue before both courts was whether the Reform Act was intended to apply retroactively to already pending cases. *See District 65 v. Prudential Sec.,* 925 F.Supp. 1551, 1566 (N.D.Ga.1996); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68 (S.D.N.Y.1996). In these circumstances, both courts found that the plaintiffs had a right to bring the RICO cause of action at the time they filed the complaint, and therefore declined to apply the new statute. Here, in contrast, the question is not whether the Reform Act applies to a case pending at the time of enactment, but whether it applies to a complaint filed *after* enactment.

Plaintiffs also contend that their RICO claim should be permitted to stand because the related *Primavera* action was filed prior to passage of the Reform Act. However, the *Primavera* complaint is irrelevant here. Plaintiffs attempt to analogize their situation to that of a class plaintiff whose time to file a complaint is extended by the filing of a class complaint. There is no support for this novel position. Plaintiffs here have chosen to file a separate complaint, essentially opting out of the putative class action, and thus cannot reap the benefits of the filing of that action. Moreover, tolling a statute of limitations is entirely different from suspending the effect of an act of Congress.

Accordingly, Plaintiffs' RICO claims will be dismissed.

### III. *This Court Will Retain Jurisdiction Over the Remaining State–Law Claims*

Plaintiffs contend that, in the event the RICO claims are dismissed, this Court should decline jurisdiction over the remaining claims, which arise under state law. Kidder and Bear Stearns contend that this Court should exercise jurisdiction over the remaining claims under 28 U.S.C. § 1334(b) or 28 U.S.C. § 1367.

Section 1334(b) provides, "Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Defendants contend that Plaintiffs' claims are "related to" the bankruptcy proceedings involving the Funds.

■■■ The test for determining whether a particular claim is "related to" a pending bankruptcy proceeding is whether the outcome of the claim might have any "conceivable effect" on the bankruptcy estate. *See In re Cuyahoga Equipment Corp.,* 980 F.2d 110, 114 (2d Cir.1992). Thus, the proceeding need not be against the debtor or the debtor's property to be within the jurisdiction conferred by § 1334; if the outcome of the proceeding "could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively)" or "in any way impact[ ]" upon the handling and administration of the bankrupt estate, it is "related to" the bankruptcy. *In re Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984).

■■■ However, "related to" jurisdiction is not without limits. "[B]ankruptcy courts have no jurisdiction over proceedings that have no effect on the debtor." *Celotex Corporation v. Edwards,* 514 U.S. 300, —— n. 6, 115 S.Ct. 1493, 1499 n. 6, 131 L.Ed.2d 403 (1995). There must be a "significant connection" to the bankruptcy case for the district court to have jurisdiction over otherwise non-federal claims. *In re Turner,* 724 F.2d 338, 340–41 (2d Cir.1983) (Friendly, J.).

■■■ Plaintiffs contend that their state claims are not related to the bankruptcy action, because their resolution will not affect the bankruptcy estate. They argue that the claims they assert are solely their claims, not those of the Funds, and thus will not diminish or increase the debtor's estate. However, the prosecution of this individual action may delay resolution of the bankruptcy proceeding, since some of the claims may indeed belong to the bankruptcy estate. If this Court were to remand the action to the state courts, the determination of whether these claims belong to the Funds would be further delayed. Such a delay could conceivably "impact[ ] upon the handling and administration of the bankrupt estate" by postponing the ultimate resolution of the debtor's bankruptcy petition. Such a potential effect on the debtor confers upon this Court original jurisdiction over the Plaintiffs' remaining claims. *Cf. Celotex,* 514 U.S. at —— – ——, 115 S.Ct. at 1499–1500 (proceeding against surety for execution on supersedeas bond is "related to" debtor's bankruptcy, even though it does not directly affect debtor, because immediate execution on bond could have adverse effect on bankruptcy proceedings by inducing sureties to lift stay to reach debtor's collateral, thus unravelling reorganization).

■■■ Moreover, even if this Court does not have original jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1334(b), section 1367 grants a federal court supplemental jurisdiction "over all other claims that are so related to claims in the action within [the court's original jurisdiction] that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Plaintiffs' state-law claims, which arise out of the same operative facts as their federal RICO claim, fall within this Court's supplemental jurisdiction.

■■■ Supplemental jurisdiction is a doctrine of discretion, not of right. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). A district court "may decline juris-

diction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In determining whether to decline jurisdiction in such a case, a court should "weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir.1994) (citing *Castellano v. Board of Trustees*, 937 F.2d 752, 758 (2d Cir.1991)).

Ordinarily, when all federal claims in a suit are dismissed early in the proceedings, a federal court will be more likely to exercise its discretion to dismiss or remand remaining state law claims. *See Purgess*, 33 F.3d at 138; *Ernst & Co. v. Marine Midland Bank, N.A.*, 920 F.Supp. 58, 62 (S.D.N.Y.1996). Remand in such circumstances is usually warranted because the federal court has "invested little time and has minimal familiarity with the particularities of [the] case." *North American Development, Inc. v. Shahbazi*, No. 95 Civ. 4803, 1996 WL 306538, *8 (S.D.N.Y. June 6, 1996).

Here, however, the District Court and the Bankruptcy Court have acquired familiarity with the alleged facts of this case, both through the bankruptcy proceedings and through the *Primavera* action. Moreover, it will be in the interests of judicial economy and fairness to the Defendants to litigate actions related to the demise of the Funds in one forum. It will be possible to conduct coordinated discovery and minimize the likelihood of inconsistent results in similar cases.

Therefore, in the interests of judicial economy, convenience and fairness to the parties, jurisdiction will be retained.

## IV. *The Fraud Claim Against ACM Will Not Be Dismissed*

### A. *The Fraud Claim Will Not Be Dismissed Under Rule 12(b)(6)*

■ To establish a claim for common law fraud in New York, it is necessary to show: (1) a defendant's material, false representation, (2) made with intent to defraud thereby, (3) reasonable reliance upon the representation by plaintiff, (4) causing damage to the plaintiff. *See, e.g., Morin v. Trupin*, 711

F.Supp. 97, 103 (S.D.N.Y.1989) (citing *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987)); *Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1230 (S.D.N.Y.1982).

ACM contends that the fraud claims should be dismissed pursuant to Rule 12(b)(6) on two grounds: (1) the extensive risk disclosures in the Funds' private placement memoranda ("PPMs") bar plaintiffs, under the "bespeaks caution" doctrine, from proving that they reasonably relied on the allegedly fraudulent statements; and (2) Plaintiffs are unable to plead the element of loss causation.

### (1) *Bespeaks Caution Doctrine*

■ Generally, defendants cannot be held liable for securities fraud "for statements which 'bespeak caution,' purport to be speculative, or 'set forth that they are based on supplied facts, but ... additionally state that there is no implication that the results predicted can or will be achieved.'" *Heil v. Lebow*, [1994–1995 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 98,465, at 91,188 1994 WL 637686 (S.D.N.Y. Nov. 14, 1994) (proxy statement's inclusion of "twelve pages of risk factors" as well as numerous other cautionary language mandated summary judgment for defendants on a Section 10(b) claim) (*quoting Stevens v. Equidyne Extractive Indus. 1980*, 694 F.Supp. 1057, 1064 (S.D.N.Y.1988)), *aff'd*, 99 F.3d 401 (2d Cir.1995); *see also I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir.1991); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986).

As a threshold matter, it is not clear that the "bespeaks caution" doctrine is recognized under New York law. The decision ACM relies upon most extensively did not address the question directly; it applied that doctrine to federal "securities law violations" and then dismissed the pendent state-law fraud claim for lack of jurisdiction. *In re Hyperion Sec. Litig.*, [1995–1996 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,906, at 93,362, 1995 WL 422480 (S.D.N.Y. July 14, 1995).

The parties have not identified any New York state court cases applying the bespeaks caution doctrine to a common law claim. However, this Court has applied the doctrine

to dismiss a common law fraud claim pendent to a Rule 10b–5 claim. *McCoy v. Goldberg,* 883 F.Supp. 927, 934–36 (S.D.N.Y.1995).

To the extent the "bespeaks caution" doctrine is applicable to a fraud claim brought under New York law, it is simply an alternative formulation of the general requirement that a plaintiff plead and prove reasonable reliance as an element of the fraud claim. Courts applying New York law generally have found that the question of a plaintiff's reasonable reliance raises issues of fact that should not be resolved on a motion to dismiss. *See, e.g., City of Amsterdam v. Daniel Goldreyer, Ltd.,* 882 F.Supp. 1273, 1281–82 (E.D.N.Y.1995); *Whitbread (US) Holdings, Inc. v. Baron Philippe de Rothschild, S.A.,* 630 F.Supp. 972, 978 (S.D.N.Y.1986); *In re Argo Communications Corp.,* 134 B.R. 776, 793 (Bankr.S.D.N.Y.1991); *Country World v. Imperial Frozen Foods Co.,* 186 A.D.2d 781, 782, 589 N.Y.S.2d 81, 82 (2d Dep't 1992); *see also Fecht v. Price Co.,* 70 F.3d 1078, 1082 (9th Cir.1995), ("[i]nclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading"); *Rohland v. Syn–Fuel Assocs.—1982 Ltd. Partnership.,* 879 F.Supp. 322, 333 (S.D.N.Y. 1995) (bespeaks caution doctrine raises fact issues); *Freschi v. Grand Coal Venture,* 551 F.Supp. at 1226 ("this court cannot conclude as a matter of law that [plaintiff] should have suspected fraud because the investment was [disclosed as] high risk and there was no certainty as to its returns").

 Moreover, even if the "bespeaks caution" doctrine provided a basis for dismissal of a common law fraud claim at the pleadings stage, it would not bar the Plaintiffs' claim here.

ACM points to several sections of the Funds' Private Placement Memoranda ("PPMs"), asserting that throughout those documents, it was stated that ACM's market-neutral strategy was merely a strategy, with no assurances of success. The PPMs also warned investors of the lack of liquidity of individual CMOs and the riskiness of individual CMOs. Although a colorable argument can be made that the PPMs warned investors about the contingencies upon which Plaintiffs' claims are based, the allegations of the Complaint, drawing all inferences in Plaintiffs' favor, present circumstances making application of the doctrine inappropriate at the pleading stage in this case.

 It is true that bad forecasting alone is not actionable. *See Shields,* 25 F.3d at 1129 ("misguided optimism is not a cause of action"). However, Plaintiffs here have alleged not only that ACM made overly optimistic projections about the performance of the funds, but that ACM made material misrepresentations about its existing methods for selecting and evaluating securities and about the current performance of the Funds. Such misrepresentations or omissions of present or historical fact are not protected under the bespeaks caution doctrine. *Primavera,* 1996 WL 494904 at *9; *In re Regeneron Pharmaceuticals Sec. Litig.,* No. 94 Civ. 1785, 1995 WL 228336 at *5 (S.D.N.Y. March 10, 1995). *See also Gray v. First Winthrop Corp.,* 82 F.3d 877 (9th Cir.1996); *Fecht,* 70 F.3d at 1081 (9th Cir.1995). Rather, the bespeaks caution doctrine protects only future- and forward-looking statements. *Primavera,* 1996 WL 494904 at *9; *Pincus,* 936 F.2d at 763; *Regeneron,* 1995 WL 228336 at *5.

The Complaint here alleges, at least in part, that ACM made statements of current or historical fact that ACM knew to be false at the time they were made.[2] For example, the Complaint alleges that ACM touted its use of proprietary, quantitative analytical models to identify and select high yield bonds

---

2. ACM also contends that many of the alleged misrepresentations were contained in marketing materials, and that Plaintiffs could not, as a matter of law, justifiably rely on such materials when the PPMs disclosed the risks of investment. However, the Second Circuit has recognized that under some circumstances, "information or representations outside of the Prospectus may be material and justify reliance." *Brown v. E.F.* *Hutton Group,* 991 F.2d 1020, 1032 n. 4 (2d Cir.1993) ("[W]e do not imply that the defendants can disclaim responsibility for their misrepresentations simply by disclosing the risks in the memorandum and therein warning investors not to rely on representations not contained in the memorandum.") (quoting *Zobrist v. Coal-X, Inc.,* 708 F.2d 1511, 1516–17 (10th Cir.1983)).

that would, in combination with other CMOs, form a hedged, lower risk portfolio. ¶¶ 38–42. ACM also allegedly represented that the Funds' portfolios are "hedged so as to maintain a relatively constant portfolio value, even through large interest rate swings." ¶¶ 29, 36.

The Complaint further alleges that each of these statements and others were materially false and misleading when made and that Defendants knew or were reckless in not knowing of such falsity. *See, e.g.,* Complaint ¶¶ 46, 48, 67, 71, 72–76 (ACM maintained tilted portfolios susceptible to interest rate increases); ¶¶ 103–108 (ACM did not have or use proprietary quantitative analytical methods, but relied on gut feelings or pressure from brokers). No cautionary statements can immunize the defendants if they knew or recklessly disregarded that these representations were false at the time they were made. *See In re First Amer. Ctr. Secs. Litig.,* 807 F.Supp. 326, 333 (S.D.N.Y.1992) (*citing Luce,* 802 F.2d at 57 (2d Cir.1986)); *Kline v. First Western Gov't Secs., Inc.,* 24 F.3d 480, 489 (3d Cir.1994). The bespeaks caution doctrine is, therefore, inapplicable to the allegations of this complaint.

Accordingly, the fraud claim against ACM will not be dismissed for failure to plead justifiable reliance.

### (2) *Loss Causation*

ACM contends that, because of the existence of numerous restrictions on withdrawal of investments in the Funds, Plaintiffs cannot establish, as a matter of law, that the fraudulent statements or omissions caused their losses. ACM argues that because none of the Plaintiffs could withdraw their investments until a date after the Funds collapsed, their damages were caused not by ACM's alleged fraud, but by their contractual inability to withdraw their investments prior to the loss.

■ Loss causation is an essential element of a common law fraud claim under New York law. *See Revak v. SEC Realty Corp.,* 18 F.3d 81, 89–90 (2d Cir.1994) (granting summary judgment for lack of loss causation). "The requisite causation is established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes." *Id.*

ACM's argument that the withdrawal restrictions mandate dismissal here is deficient in a number of respects. First, ACM contends that the Plaintiffs' allegations that they were induced by ACM's continuing misrepresentations and omissions to *retain* securities they would otherwise have redeemed or sold fail for lack of damage causation, but does *not* address the Plaintiffs' claim that ACM's misrepresentations induced their initial *purchase* of interests in the Fund. Hence, even if accepted, ACM's loss causation argument would not dispose of the entire fraud claim.

■ Moreover, ACM's theory would permit tortfeasors avoid liability for misrepresentations that induce retention of securities by simply including withdrawal restrictions in the agreements with the investors they mislead. Since withdrawal restrictions are common, acceptance of ACM's theory could substantially undermine the settled principle that the common law provides a remedy for misrepresentations that induce retention of securities. *See Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708–10 (2d Cir.1980); *Kaufman v. Chase Manhattan Bank, N.A.,* 581 F.Supp. 350, 354 (S.D.N.Y.1984) (causation established where misrepresentation could have been found to induce both purchase and retention of investment); *Freschi v. Grand Coal Venture,* 551 F.Supp. at 1230 ("Unlike [a] Section 10(b) claim, [a] common law claim" exists where "ongoing concealment" causes the retention of a security).

■ ACM's argument also fails to recognize that, as a factual matter, Plaintiffs might have avoided the loss by requesting permission from the Funds to sell or redeem their interests before the time when they could compel redemption or alienate their interests at will. The terms of the investments concededly provided for such sales and redemptions with prior permission from the Funds. It is a question of fact, inappropriate for resolution at the pleading stage, whether Plaintiffs would have requested and received such permission had they not been misled.

Furthermore, Plaintiffs were not limited to their contractual rights. If ACM had re-

vealed the allegedly inadequate and inappropriate investment methods used by the Funds, the Plaintiffs could have exercised their respective rights to rescind their fraudulently induced purchase of Fund interests. *See Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44–45 (2d Cir.1991) (party stated claim for rescission of agreement procured by fraud); *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406–07, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958) (rescission is appropriate remedy for fraud). The alleged ongoing misrepresentations and concealment deprived the Plaintiffs of the opportunity to assert such claims before they suffered their alleged losses. ACM's effective interference with the Plaintiffs' recision rights thus caused their damages. *See Dupuis v. Van Natten*, 61 A.D.2d 293, 295, 402 N.Y.S.2d 242, 243 (3d Dep't 1978) (plaintiff can state claim based on impairment of his right to commence a timely action due to fraudulent concealment by defendant).

### B. The Fraud Claim Will Not Be Dismissed Under Rule 9(b)

ACM contends that the Plaintiffs' fraud claim should be dismissed for failure to plead fraud with the particularity required by Rule 9(b). Specifically, ACM contends that: (1) Plaintiffs do not adequately identify or differentiate the allegedly fraudulent statements made to the individual plaintiffs, and (2) Plaintiffs fail to plead facts that give rise to the requisite "strong inference" of fraudulent intent.

To comply with Rule 9(b), a complaint must generally identify with specificity the statements it claims were misleading, state the date and place of the alleged misrepresentations, and identify those who made the statements. *See Shields*, 25 F.3d at 1127–28 (federal securities fraud); *McLaughlin*, 962 F.2d at 191 (federal mail fraud). ACM contends that Plaintiffs have failed to identify the false statements upon which they base their claim with the requisite specificity.

However, Plaintiffs identify and quote from specific written materials they allege were distributed to and relied upon by them, and describe how these materials were false or failed to disclose material information. *See, e.g.*, Complaint ¶¶ 2, 4, 34, 36–44, 46–52, 59, 68–130. Where, as here, a complaint alleges that specific, identifiable written materials concededly disseminated by a defendant contain misrepresentations upon which Plaintiffs relied, the Rule 9(b) pleading requirements concerning identification of the allegedly fraudulent statements, and specification of their time, place and speaker, are satisfied. *See Shields*, 25 F.3d at 1129 (reliance on press releases and publicly filed corporate documents satisfies Rule 9(b) particularity requirements). When such written, easily identifiable statements are relied upon by a plaintiff, a defendant cannot plausibly complain that he does not have sufficient notice of the time, place and speaker to prepare an adequate defense.

Plaintiffs must also plead scienter with specificity. A complaint may give rise to a sufficient inference of fraudulent intent in two ways: (1) by alleging a motive and clear opportunity to commit fraud; and (2) where motive is not apparent, by identifying circumstances "indicating conscious behavior" by the defendant. *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995) (citations omitted). When relying on circumstances indicating conscious behavior, the strength of the circumstantial evidence must be greater. *Id.*

There is no dispute that ACM, as the fund manager making investment decisions and producing the allegedly fraudulent marketing and private placement materials, had a clear opportunity to defraud the Plaintiffs. *See Jaquith v. Newhard*, 1993 WL 127212, *7 (S.D.N.Y. Apr. 20, 1993) (defendant, as president of company, had clear opportunity to misrepresent company's value to fraudulently induce loan from plaintiff).

With respect to motive, Plaintiffs allege that ACM was paid fees based on a percentage of the dollar amount invested in the funds it managed and also received a percentage of profits in excess of its target rates of return. Compl. ¶ 60. This fee structure allegedly gave ACM a motive to misrepresent its fund management strategy and methods and overstate its profits, both to

attract and retain investments and to reap higher fees on the inflated profits. ¶¶ 61–62.

■ Although the desire to enhance income may motivate a person to commit fraud, allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b). *See Shields,* 25 F.3d at 1130. "On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations." *Id.* Because Plaintiffs point to no other motivation for ACM's alleged fraud, the Complaint does not adequately allege a motive for the fraud.

■ Plaintiffs point to a number of other allegations in the complaint that it claims support an inference of fraudulent intent. The vast majority of these allegations are conclusory assertions that ACM acted "intentionally," "knowingly" or "recklessly," *See, e.g.,* Compl. ¶¶ 46–50, 71, 97, 124, 150–51, and thus do not give rise to an inference of conscious conduct evincing fraudulent intent.

■ However, Plaintiffs' most particular allegations—those relating to ACM's claims that it used proprietary, quantitative analytical methods to model the behavior of highly esoteric CMO derivatives and the upward negotiation of performance marks—do give rise to a sufficiently strong inference of conscious behavior to satisfy Rule 9(b)'s scienter requirements.[3]

Plaintiffs identify a number of statements in which ACM claimed to use sophisticated analytical modeling to select securities for and appropriately hedge the Funds. Complaint ¶¶ 40–42. Plaintiff alleges that ACM never had or used such analytical methods, Complaint ¶¶ 46, 49, 103–108, and that the securities purchased could not, in fact, be modeled. Complaint ¶ 68. While these allegations might be insufficient in themselves, the Complaint also contains the following factual support for them: (1) the Brokers believed the CMOs and CMO derivatives purchased could not be modeled or hedged,

Complaint ¶¶ 69–70 (quoting tapes of broker conversations); (2) the securities were traded in an exceedingly small market controlled by the Brokers, Complaint ¶¶ 53–54, 59 (Brokers controlled over 40% of CMO market, ACM purchased 65% of its securities from Brokers, ACM was purchaser of vast majority of Brokers' most toxic CMO tranches); (3) the securities were not listed on any exchange, Complaint ¶ 50; and (4) the securities were valued by negotiation with the Brokers, Complaint ¶¶ 121–129, not by reference to market prices or analytical tools.

While these allegations do not give rise to an inference that ACM intentionally engaged in a bullish strategy or even willfully misvalued the securities it purchased for the Funds, *see Primavera,* 1996 WL 494904, at *21, they do give rise to an inference that ACM knew at the time they made representations about their methods for obtaining securities that they did not have the analytical capacities they claimed to have. Valuing CMOs is "an art, not a science." *Id.* Here, ACM is alleged to have represented that it had reduced the art of valuing and modeling CMOs to a "proprietary, quantitative" science, when in fact it was relying on intuition and pressure from the Brokers. The alleged impossibility of scientifically evaluating these CMOs supports a permissible inference that ACM knowingly misrepresented its methods to induce and retain investments.

■ Finally, it is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant. *See Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir.1974). Here, information about the existence and use of the purportedly proprietary method of analyzing securities is within the control of ACM. It is inappropriate to dismiss, prior to discovery, a claim based on failure to specifically allege the absence of a model whose existence or non-existence only ACM can demonstrate.

Accordingly, the fraud claim against ACM will not be dismissed.

---

**3.** Plaintiffs' fraud claim in *Primavera* was dismissed for failure to plead scienter with sufficient specificity. Although the allegations in the *Primavera* complaint were similar to those in this complaint, plaintiffs in *Primavera* were granted leave to replead, and their allegations will thus be subject to further review by this Court.

## V. *The Aiding and Abetting Fraud Claim Against the Brokers Will Not Be Dismissed*

 To state a claim for aiding and abetting a common law fraud, a plaintiff must allege: (1) the existence of the primary fraud; (2) the aider and abettor's knowledge of the fraud; and (3) substantial assistance by the aider and abettor. *Tribune v. Purcigliotti,* 869 F.Supp. 1076, 1100 (S.D.N.Y. 1994), *aff'd,* 66 F.3d 12 (2d Cir.1995). A claim of aiding and abetting fraud must meet the pleading requirements of Rule 9(b). *Morin v. Trupin,* 711 F.Supp. at 112 (S.D.N.Y. 1989).

The Brokers attempt to separate the fraud claim into independent claims of "fraudulent inducement" and "fraudulent maintenance." The Brokers contend that the fraudulent inducement claim (i.e., the claim that the Investor's were induced to make their initial purchase of securities by ACM's misrepresentations) fails because Plaintiffs have not alleged that the Brokers provided substantial assistance by participating in the preparation or dissemination of the allegedly false statements.

 Defendants' contentions, however, are insufficient to defeat Plaintiffs' aiding and abetting fraud claim. It is true that where the primary fraud claim is predicated on misrepresentations in or omissions from documents, the substantial assistance of an unrelated third party must generally relate to the preparation or dissemination of the false statements themselves. *Morin,* 711 F.Supp. at 113. However, Plaintiffs here allege a highly interdependent scheme in which both parties benefitted from ACM's fraudulent activity. In such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient. *See, e.g., Bruce v. Martin,* No. 87 Civ. 7737, 1990 WL 52180 at *5 (S.D.N.Y. April 13, 1990).

 Moreover, even in the absence of a duty to act or disclose information, inaction on the alleged aider and abettor's part can provide a basis for liability where the inaction was "designed intentionally to aid the primary fraud." *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *see also National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 207 (2d Cir.1989); *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 925–27 (2d Cir.1980). Thus, where there are particularly strong allegations of motivation and scienter, the allegations of substantial assistance need not be as directly tied to the production and dissemination of the misleading documents themselves. See *IIT,* 619 F.2d at 922 ("there may be a nexus between the degree of scienter and the requirement that the alleged aider and abettor render 'substantial assistance' "). As discussed below, the allegations of motivation and scienter on the part of the Brokers are quite strong in this case. Accordingly, the allegations related to the Brokers' involvement in the fraudulent scheme need not be limited to assistance with the preparation of the materials themselves, and their provision of the allegedly "toxic" securities and lenient financing constitute substantial assistance in the fraud.

The Brokers next contend that the primary "fraudulent maintenance" claims (i.e., the claims that ongoing misrepresentations of Fund performance and concealment of ACM's actual investing practices prevented plaintiffs from withdrawing their investments) are either inadequately pleaded or are simply claims of corporate mismanagement, which Plaintiffs have no standing to assert. Thus, Defendants argue, Plaintiffs have not pleaded the existence of a primary fraud that the Brokers aided and abetted.

 The Brokers' contention that the primary fraudulent maintenance claims are inadequately pleaded is unpersuasive. The Brokers argue that the claim is inadequately pleaded because the Plaintiffs fail to identify the post-investment statements that induced reliance. Assuming arguendo that the distinction between fraudulent inducement and fraudulent maintenance is a valid one under the circumstances, Plaintiffs have adequately pleaded the fraudulent maintenance claims. First, Plaintiffs have identified a process by which the Brokers and ACM would negotiate inflated marks and pass them on to investors

in regular monthly "flash" and "final" reports of Fund performance. These alleged monthly mailings are adequately pleaded "post-investment" statements upon which Plaintiffs relied in retaining their interests in the Funds, since the time, place, and "speaker" can be easily identified. Moreover, the fraudulent maintenance claim is not predicated exclusively on the existence of post-investment statements, but on ACM's failure to disclose the falsity of the statements that initially induced the Plaintiffs' investments. ACM, which had a direct relationship with the Plaintiffs, clearly has an affirmative duty to disclose such information, and its failure to do so constitutes a primary fraud upon which an aiding and abetting claim can be based. Thus the primary fraudulent maintenance claim is adequately pleaded.

Defendants also contend that the "fraudulent maintenance" claims are really corporate mismanagement claims, and as such are derivative and belong to the mismanaged entity (or where the entity is in bankruptcy, to the trustee of the entity). See In re Granite Partners, 194 B.R. at 327; Primavera, 1996 WL 494904, *14–18.

In Primavera, this Court held that the breach of fiduciary duty and third-party breach of contract claims were derivative, and thus the plaintiffs had no standing to bring them individually. 1996 WL 494904 at *14–18. Defendants read Primavera to have dismissed on standing grounds claims that they characterize as fraudulent maintenance claims.

However, Primavera did not rely upon a distinction between fraudulent inducement and fraudulent maintenance in dismissing the breach of fiduciary duty and third-party breach of contract claims. Breach of fiduciary duty and third-party breach of contract claims are distinguishable from fraudulent maintenance claims. While the former are derivative, a fraudulent maintenance claim is recognized as a direct cause of action. See Marbury Management, 629 F.2d at 708–09.

■■■ In analyzing whether a claim is derivative or direct, a court must look to the nature of the alleged wrong, not to the designations the parties impose upon the claim. See, Rabkin v. Philip A. Hunt Chem. Corp.,

547 A.2d 963, 968 (Del.Ch.1986); Kobin v. Goodman, 222 N.Y.S.2d 744, 746 (Sup.Ct. N.Y.Cty 1961). Defendants contention is essentially that, despite Plaintiffs' designation of its claim as a fraud claim, the "nature of the wrong" alleged in connection with the fraudulent maintenance component of the claim is really a derivative corporate mismanagement claim. It is true that some of the Plaintiffs' allegations related to the fraud in this case, such as the purchase of inappropriate and unmodelable securities, would also go to a claim of corporate mismanagement. However, Plaintiffs allege not only that ACM purchased inappropriate and unmodelable securities, but that it also made representations about its ability to model and hedge these securities. As discussed above, the Plaintiffs have adequately alleged that these representations were false and that ACM knew they were false at the time they were made. Thus, the representation that ACM would model the securities it purchased, when coupled with the reality that they did not and could not model them, constitutes fraud, not mismanagement. Moreover, the allegations that ACM and the Brokers negotiated inflated marks to be passed on to investors are allegations of fraudulent representations, not mismanagement. Thus, the fraud claims are direct, not derivative, and thus are the Plaintiffs' to prosecute.

■■■ Defendants next contend that Plaintiffs have failed to allege substantial assistance of the fraudulent scheme. The Complaint alleges that the Brokers each knowingly created volatile and virtually unmerchantable securities the essential characteristics of which could barely be discerned. Tape recordings cited in the Complaint show that Kidder's representatives agreed among themselves that it was nearly impossible to get a "handle" on the value of the "crap" that they and the other Brokers sold to ACM. Complaint ¶ 70. Kidder also concluded that certain securities sold by DLJ could not be understood, let alone hedged. See id. at ¶ 69.

The Brokers allegedly sold such securities to ACM despite their knowledge that ACM was bound to purchase only "high quality,"

"low risk" securities that could be modeled and utilized to create market-neutral portfolios. The Brokers allegedly knew that ACM's touted analytical models did not exist, and the Brokers' belief that the securities could not be modeled supports an inference that they knew that ACM misrepresented its analytical capacity.

The Brokers allegedly induced their sales forces to market unmodelable securities to ACM by multiplying several-fold the commissions paid on such transactions. Complaint ¶ 64–66. These sales were financed by the Brokers themselves on terms that were allegedly created specifically for ACM and that caused ACM to become excessively leveraged and illiquid. As the Second Circuit has noted, "substantial assistance might include ... executing transactions or investing proceeds, or perhaps ... financing transactions." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir.1978) (*quoting* 2 A. Bromberg, *Securities Law*, § 8.5 at 515 (1974)). Participation in the financing of a fraudulent scheme, particularly where, as here, it is alleged that the financing was not routine, constitutes substantial assistance. *See, e.g., Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 800–04 (3d Cir.1978) (bank's atypical financing transactions constituted substantial assistance); *Bruce v. Martin*, 1990 WL 52180, at *5 (Sweet, J.) (upholding substantial assistance allegation that amounted to a "suggestion ... that the Sureties were not operating from only the ordinary economic motivation of collecting the premium"); *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F.Supp. 493, 504 (S.D.N.Y.1987) (participation in "atypical financing transactions" supports aider and abetter liability). Finally, the Brokers are alleged to have helped perpetuate ACM's fraud by providing to ACM false and inflated "performance marks" for ultimate dissemination to the Investors.[4] These Broker practices encouraged and facilitated the ongoing fraudulent scheme, and thus constitute substantial assistance. *See Bruce v. Martin*, 1990 WL 52180 at *5.

The Brokers contend that their dealings with ACM amounted to nothing more than ordinary-course transactions, and thus their silence and inaction in failing to inform Plaintiffs of ACM's fraud is not actionable as aiding and abetting. *See Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95–96 (5th Cir.1975). However, the Brokers were *active* participants in the symbiotic fraudulent scheme alleged by Plaintiffs. Unlike the typical relationship between brokers and customers, ACM and the Funds relied on the Brokers to create new CMOs, to finance CMO purchases and to maintain a general market for such securities. In turn, the many Brokers relied on the Funds—which were among their largest and most important CMO customers—to purchase a large proportion of the Brokers' most "toxic," "deal-driving" CMO tranches. Given the esoteric nature of CMOs and the fact that the Brokers created and maintained a market for such instruments, the assistance they provided in directing millions of dollars worth of exotic securities to ACM can be regarded as unusual, rather than routine, in character and degree. The allegations that the Brokers engaged in these activities and did so to prop up ACM and their multi-billion dollar market in CMOs, *see* Complaint ¶ 65 (Kidder representative stating that "we are in bed with [ACM]"), adequately supports the claim that the Brokers substantially assisted ACM's fraud.

Moreover, as recognized in *National Union*, 892 F.2d at 207 (2d Cir.1989), even silence or inaction that is designed to aid a primary fraud, particularly where there is a heightened economic motivation to do so, *IIT*, 619 F.2d at 922, 926–27 may constitute substantial assistance. Here, even if the Brokers had merely executed "ordinary course" trades and remained silent about ACM's misrepresentations, allegations of their extraordinary economic motivation to aid in the fraud would suffice at the pleading stage with respect to the substantial assistance element.

---

4. Although Plaintiff's concede that some of the quotations of specific marks in the Complaint were inaccurate, the allegation that the Brokers' negotiated marks upward from those they initial-

ly provided to ACM supports an inference of substantial assistance in ACM's ongoing misrepresentations about the Fund's performance.

Finally, Defendants contend that Plaintiffs have not adequately alleged scienter. To adequately plead scienter in an aiding and abetting fraud claim, Plaintiffs must allege sufficient facts to support a "strong inference" of fraudulent intent. *Beck*, 820 F.2d at 50; *Dreieck Finanz AG v. Sun*, No. 89 Civ. 4347, 1990 WL 11537, at *12 (S.D.N.Y. Feb. 9, 1990). Plaintiffs may raise such an inference in one of two ways: (1) by alleging facts showing a motive for participating in a fraudulent scheme and a clear opportunity to do so; or (2) by identifying circumstances indicative of conscious behavior. *Dreieck*, 1990 WL 11537 at *12. Plaintiffs have alleged both "motive and opportunity" and circumstances indicative of conscious behavior.[5]

Plaintiffs have alleged a powerful motivation for the Brokers' participation in the fraudulent scheme. The Brokers assert that ordinary economic motives are insufficient to support the scienter element of an aiding and abetting claim. *See Shields*, 25 F.3d at 1130. Here, however, the Brokers' "economic motives" were extraordinary. They allegedly earned extremely high fees, including special commissions, on the sale of "toxic" securities to ACM. They needed to make these sales to ACM, because ACM was one of the few buyers of these risky instruments, and their sale was essential to making a profit on any given CMO offering. The Brokers' needed ACM to continue purchasing these securities to perpetuate the Brokers' multi-billion-dollar market for CMOs. ACM would not have been able to continue purchasing these instruments if the investors had been told the truth about them, so the Brokers had a motive to assist in the perpe-tration of the fraud. Such allegations of motive are sufficient to infer not only knowledge of fraud, but an intent that the fraud continue.

Moreover, Plaintiffs allege circumstances indicative of conscious behavior. Plaintiffs allege that each Broker knowingly provided inflated marks to ACM, increasing original valuations after negotiation, to allow ACM to report false valuations and returns to its investors. Complaint ¶¶ 121–29.[6] This allegation of negotiation strongly suggests that the Brokers knew the marks were fictional. It also suggests that the Brokers knew that any purported "quantitative" model for analyzing the securities was fictional.

Accordingly, scienter has been properly pleaded.

## VI. *The Breach of Fiduciary Duty Claim and Aiding and Abetting Breach of Fiduciary Duty Claim Will Be Dismissed*

The Bankruptcy Court has determined that plaintiffs in the *Primavera* action did not have standing to assert breach of fiduciary duty claims against ACM, because such claims belonged solely to the trustee. *In re Granite Partners, L.P.*, 194 B.R. 318, 327–28 (Bkrptcy S.D.N.Y.1996). Moreover, this Court has held that the plaintiffs in the *Primavera* action did not have standing to assert their claims of aiding and abetting breach of fiduciary duty against the Broker defendants, because such claims are derivative, not direct, under the law of the Cayman Islands and Delaware, where the Funds were incorporated. 1996 WL 494904 at *12–17. Since the analysis in those cases applies

---

5. It is appropriate in some circumstances to apply more exacting scrutiny to allegations of scienter against an aider and abettor than would be applied to allegations against the primary perpetrator, since the "scienter requirement scales upward when activity is more remote" *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir.1979); *National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 511 N.Y.S.2d 626, 630 (1st Dep't), *appeal denied*, 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (1987). The Complaint here, however, alleged a symbiotic fraudulent scheme between ACM and the Brokers, not a "remote" relationship. In these circumstances, the scienter re-quirement need not be more exacting than that applied to the primary fraud.

6. DLJ attacks the Complaint for inappropriately "lumping" the Brokers together. However, where, as here, the complaint is sufficiently detailed to permit a response, the failure to separate allegations of knowledge is not fatal. *See e.g., Memphis Housing Auth. v. Paine, Webber Jackson & Curtis, Inc.*, 639 F.Supp. 108, 110–11 (W.D.Tenn.1986) (complaint's failure to itemize the acts of three broker defendants is not fatal where the "allegations are ... sufficient to allow response").

equally here, the breach of fiduciary duty and aiding and abetting ·breach of fiduciary duty claims will be dismissed.

Under the law of the Cayman Islands— where both Granite Corp. and Quartz are incorporated—claims based on breach of fiduciary duty, corporate mismanagement or third party action that result in the diminution of share value belong to the corporation and can only be brought by it or a shareholder suing derivatively. *See* Affidavit of Angus John Elliot Foster, dated May 30, 1996 ¶¶ 6–10 and ¶ 11. The same is true under Delaware law (Granite Partners is a Delaware limited partnership): "When an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek to recover derivatively in behalf of the corporation." *Bokat v. Getty Oil Co.,* 262 A.2d 246, 249 (Del.1970); *In re Ionosphere Clubs, Inc.,* 17 F.3d 600, 604 (2d Cir.1994) ("a shareholder asserting a direct action against a third party must allege 'special injury' ") (citation omitted) (applying Delaware law); *Moran v. Household Int'l, Inc.,* 490 A.2d 1059, 1070 (Del.Ch.) (a shareholder may sue individually only if it has alleged "an injury which is separate and · distinct from that suffered by other shareholders" or a wrong involving a contractual right of a shareholder, such as the right to vote, or assert majority control, which exists independently of any right of the corporation) (citation omitted), *aff'd,* 500 A.2d 1346 (Del.1985). Once the entity goes into bankruptcy, these claims become the property of the estate, and the trustee alone can assert them. *In re Granite Partners, L.P.,* 194 B.R. 318, 328 (Bkrptcy.S.D.N.Y.1996).

Because Plaintiffs allege no injury to themselves distinct from the injury to the Funds, they have no standing to assert the breach of fiduciary duty claim against ACM. As in *Kagan v. Edison Brothers Stores, Inc.,* 907 F.2d 690 (7th Cir.1990), "the nub of the problem is that the investors' injury flows not from what happened to them ... but from what happened to [the debtor corpora-tion] (it failed, making their stock worthless)." *Id.* at 692.

Plaintiffs contend that *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 119–20 (2d Cir.1991), and *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1094 (2d Cir. 1995) compel a different result.[7] These cases, however, do not support Plaintiffs' novel contention that breach of fiduciary duty claims predicated on an injury that is general to corporate shareholders may be brought by individual investors.

*Hirsch* held that where management was complicit with third party accountants in defrauding a debtor corporation, the bankruptcy trustee was barred by the doctrine of *in pari delicto* from bringing a claim against the accountants on behalf of the corporation. 72 F.3d at 1094. While *Hirsch* did recognize that investors had standing to assert claims based on the distribution of fraudulent PPMs that induced their individual, personal investments, *id.,* the Court did not hold that an investor has standing to assert claims of breach of fiduciary duty where the injury is to the corporation and affects investors equally according to their proportionate shares.

*Wagoner* similarly held that a bankruptcy trustee did not have standing to assert claims against a third party for defrauding a corporation with the cooperation of management, because such a claim accrues to the defrauded creditors, not the guilty corporation. 944 F.2d at 120. Because *Wagoner* involved the standing of a creditor, rather than an equity investor, it did not address the question of standing to bring derivative claims at issue in this case. Here, Plaintiffs are not individually defrauded creditors, but equity investors whose injury is general to all investors, and thus must be vindicated, if at all, by the trustee.

Plaintiffs' also appear to read *Hirsch* and *Wagoner* to confer standing on an investor when the corporation is barred by the *in pari delicto* doctrine from asserting the claim itself. However, this Court rejected just such an argument in *Primavera.* 1996 WL 494904 at *12. Standing is a constitutional

---

7. *Hirsch* and *Wagoner* both involved questions of a trustee's standing under Connecticut law, whereas the standing question here arises under the law of the Cayman Islands and Delaware.

requirement. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). The application of *in pari delicto* to bar the trustee can neither confer constitutional standing upon Plaintiffs nor transform the nature of its alleged injury from a derivative one into a direct and personal one. *Primavera*, 1996 WL 494904 at *12.

■ Only when a plaintiff alleges a "special injury" or the breach of a duty owed uniquely to him (rather than a duty to shareholders generally) may he or she bring a direct action. *Cowin v. Bresler*, 741 F.2d 410, 415 (D.C.Cir.1984); *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir.1993) (shareholders lack standing unless they are owed some "special duty"). Plaintiffs here do not allege that they suffered any unique injury apart from the loss of investment in the Funds, an injury shared by all investors. Any of the duties owed to Plaintiffs (and allegedly breached by Defendants) were owed to all investors generally as shareholders. The breach of such a general duty is insufficient to confer standing to bring a direct claim for breach of fiduciary duty against ACM or the Brokers.

### VII. *The Negligent Misrepresentation Claim Against ACM Will Be Dismissed*

■ Under New York law, to state a claim for negligent misrepresentation, a plaintiff must allege:

(1) carelessness in imparting words (2) upon which others were expected to rely (3) upon which they did act or failed to act (4) to their damage; further, (5) the author must express the words directly, with knowledge they will be acted upon, to one whom the author is bound to by some relation [of] duty or care.

*The Pits, Ltd. v. American Express Bank Int'l*, 911 F.Supp. 710, 720 (S.D.N.Y.1996). ■ "Under New York law, it is well established that '[a] defendant is not liable ... for negligent misrepresentation unless a prior relationship existed between the defendant and plaintiff.'" *Toto v. McMahan, Brafman, Morgan & Co.*, No. 93 Civ. 5894, 1995 WL 46691 at *12 (S.D.N.Y. Feb. 7, 1995) (*quoting Schwartz v. Michaels*, [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,920, at 93,852, 1992 WL 184527 (S.D.N.Y. July 23, 1992)); *see also Village on Canon v. Bankers Trust Co.*, 920 F.Supp. 520, 531 (S.D.N.Y.1996) ("Under New York law, there is no action for negligent misrepresentation of a promise of future conduct unless there is a special relationship between the parties.").

■ As in *Primavera*, Plaintiffs here have failed to allege the existence of a special relationship between them and ACM; therefore, Plaintiffs have failed to state a claim for negligent misrepresentation. 1996 WL 494904, at *18–19. A special relationship has been held to exist where, for example, there was an extended negotiation period between the parties before purchase, *Polycast Technology Corp. v. Uniroyal, Inc.*, No. 87 Civ. 3297, 1988 WL 96586, at *12 (S.D.N.Y. August 31, 1988), or where plaintiffs, who owned shares in partnerships that merged to form the defendant corporation, asserted claims against the defendant related to the merger. *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F.Supp. 1037, 1044–45, 1060 (S.D.N.Y. 1992) No similar prior relationship existed between ACM and the Plaintiffs, and as such, the claim of negligent misrepresentation with regard to pre-investment statements cannot stand.

### VIII. *The Unjust Enrichment Claims Will Be Dismissed*

Under an unjust enrichment theory, Plaintiffs seek the return of fees and charges received by each defendant, as well as the Brokers' proceeds from sales. Complaint ¶ 174.

■ To state a claim for unjust enrichment, a plaintiff must allege that the defendant was enriched at the plaintiff's expense and that the circumstances are such that equity and good conscience require that defendant make restitution. *Violette v. Armonk Assocs., L.P.*, 872 F.Supp. 1279, 1282 (S.D.N.Y.1995). Unjust enrichment is a quasi-contractual remedy, so that such a claim is ordinarily unavailable when a valid and enforceable written contract governing the

**1334**

same subject matter exists. *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987). This is true whether the contract is one between parties to the lawsuit, or where one party to the lawsuit is not a party to the contract. *Graystone Materials, Inc. v. Pyramid Champlain Co.,* 198 A.D.2d 740, 604 N.Y.S.2d 295, 296 (3d Dept. 1993); *Metropolitan Elec. Mfg. Co. v. Herbert Constr. Co.,* 183 A.D.2d 758, 583 N.Y.S.2d 497, 498 (2d Dept.1992) (plaintiff manufacturer's contract with subcontractor precluded manufacturer from equitably recovering from owner or contractor).

 As with the breach of fiduciary duty claims, the unjust enrichment claims against ACM and the Brokers belong to the Funds, not the individual investors. The fees that Plaintiffs seek to have returned were paid pursuant to investment advisory contracts between ACM and the Funds and agreements between the Funds and the Dealers. Plaintiffs do not cite any authority holding that shareholders may bring unjust enrichment claims against third parties, such as ACM and the Brokers, that transacted business with the corporate entity where, as here, the claims are based on the transactions between the corporation and the third party. Because ACM and the Brokers had valid contracts with the Funds governing the transactions in question, Plaintiffs may not assert the claims that belong to the funds. *See Villar v. Ricetta's, Inc.,* Civ. No. 95–73–P–H, 1996 WL 118519 at *2 (D.Me. Feb. 21, 1996) (unjust enrichment claim against corporate directors is derivative and cannot be asserted by shareholders); *see also Fahlenbach v. Trans Pacific Capital (USA) Inc.,* No. 95 Civ. 8776, 1996 WL 22602 at *2 (S.D.N.Y. Jan. 19, 1996) (unjust enrichment claim against investment fund's law firm asserted derivatively). Plaintiffs' own lack of a contract with the Defendants does not provide the basis for creating a quasi-contractual cause of action, when the Funds have a contractual cause of action to pursue.

Accordingly, the unjust enrichment claims will be dismissed.

*Conclusion*

For the reasons set forth above, ACM's motion is granted in part and denied in part. Specifically, ACM's motion to dismiss the claim for common law fraud is hereby denied. The claims against ACM for RICO violations, breach of fiduciary duty, negligent misrepresentation and unjust enrichment are hereby dismissed.

The Broker Defendants' motions are also granted in part and denied in part. Specifically, the Broker Defendants' motions to dismiss the aiding and abetting fraud claim are hereby denied. The claims against the Brokers for RICO violations, aiding and abetting breach of fiduciary duty and unjust enrichment are hereby dismissed.

It is so ordered.