### In re GRANITE PARTNERS, L.P., Granite Corporation, and Quartz Hedge Fund, Debtors.

Bankruptcy Nos. 94 B 41683(SMB), 94 B 41684(SMB), and 94 B 41685(SMB).

United States Bankruptcy Court, S.D. New York.

May 14, 1997.

---

Willkie Farr & Gallagher, New York City (Benito Romano, John R. Oller, of counsel), for Chapter 11 Trustee.

Berlack, Israels & Liberman, L.L.P., New York City (Steven E. Greenbaum, Edward S. Weisfelner, of counsel), for Unofficial Investors' Committee.

Gold Bennett & Cera, L.L.P., San Francisco, CA (Solomon B. Cera, Susan D. Resley, of counsel), Bernstein Litowitz Berger & Grossmann, L.L.P., New York City (Jeffrey A. Klafter, Robert S. Gans, of counsel), for Primavera Familienstiftung and Hubert Looser.

Cleary Gottlieb Steen & Hamilton, New York City (Thomas J. Moloney, Mitchell A. Lowenthal, Robin A. Henry, Carmine D. Boccuzzi, Jr., of counsel), for Kidder Peabody & Co., Inc.

Morgan, Lewis & Bockius, L.L.P., New York City (Gary G. Staab, Catherine A. Ludden, Gerald M. Freedman, of counsel), for Donaldson, Lufkin & Jenrette Securities Corporation.

## MEMORANDUM DECISION AND ORDER SUBORDINATING INVESTORS' CLAIMS UNDER 11 U.S.C. § 510(b)

STUART M. BERNSTEIN, Bankruptcy Judge.

Section 510(b) of the Bankruptcy Code mandates subordination of damage claims "arising from the purchase or sale" of a security of the debtor.[1] Many of the debtors' shareholders and limited partners filed damage claims in these cases charging a variety of wrongs covering an extended period of

---

1. Section 510(b) provides as follows:

(b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

time. Some have alleged that the debtor's post investment fraud induced them to hold on to their interests rather than sell them. The issue that the Court must decide under section 510(b) is whether this post-investment fraud gives rise to the type of claim that must be subordinated. For the reasons stated below, the Court concludes that it does.

## BACKGROUND

The background to these three cases is described in this Court's decision in *Goldin v. Primavera Familienstiftung (In re Granite Partners, L.P.)*, 194 B.R. 318 (Bankr. S.D.N.Y.1996) (*"Granite"*), and District Judge Robert W. Sweet's opinions in *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL 494904 (Aug. 30, 1996) (*"Primavera"*), and *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308 (1997) (*"ABF Capital"*). Briefly, the debtors invested in collateralized mortgage obligations created and sold, *inter alia*, by Kidder, Peabody & Co., Inc. ("Kidder"), Donaldson, Lufkin & Jenrette Securities Corp. ("DLJ") and Bear Stearns & Co., Incorporated ("Bear Stearns") (collectively, the "Brokers"). Approximately 130 entities purchased interests in the debtors, either as shareholders in Granite Corporation or Quartz Hedge Fund, or as limited partners in Granite Partners, L.P. The funds collapsed in late March and early April 1994, and the debtors filed their chapter 11 cases on April 7, 1994.

### A. The Proofs of Claim

Seventy four investors filed proofs of claim (or interest) in these cases. The chapter 11

trustee, Harrison J. Goldin (the "Trustee"), objects to the claims, or alternatively, seeks to subordinate them under section 510(b), contending that they arise from the purchase or sale of a security in one or more of the debtors. Kidder and DLJ have joined in the latter request. The members of the unofficial investors committee ("UIC")[2], Primavera Familienstiftung ("Primavera") and Hubert Looser oppose the Trustee's motion.[3] The opponents acknowledge that any damage claims arising from a fraudulent inducement to invest in the debtors must be subordinated under section 510(b). They also contend, however, that they were duped into holding on to their investments as a result of the debtor's post-investment fraud. These fraudulent retention or maintenance claims, they argue, are independent torts, do not arise from the purchase or sale of the debtor's security, and hence, should share *pari passu* with the other, general unsecured claims.

Before answering the question, I must first consider who, among the many claimants, has asserted the type of post-investment fraud claim at issue. At the outset, and except for the UIC, Primavera and Looser, all of the other investors have either defaulted on the motion, or withdrawn their objections. Most of the claims assert fraud in some conclusory fashion. Some claimants filed only the official claim form; others annexed brief explanatory statements or documents, or both, but even these still allege fraud in the inducement.[4] None purport to assert a fraudulent retention claim.

### B. The District Court Complaints

Primavera and the UIC have also filed district court complaints in which they allege

2. The UIC represent approximately 50% of the investors that filed claims. The committee itself has no independent standing, but for convenience, this decision refers simply to the UIC even though the reference to each of its members may be more accurate.

3. Additional investors, John G. Polk, Lionel N. Sterling and Whitehead Institute for Biomedical Research, also filed objections to the motions. These objections have since been withdrawn.

4. For example, Primavera filed a proof of claim in the Granite Corp. case in the amount of $1 million, and Looser filed a proof of claim in the

Quartz case in the amount of $1.4 million. Both claimants attached nearly identical addenda stating that the "Debtor ... through ACM, Askin and Bradshaw–Mack, made false representations of material fact to Claimant's agent ... with the intent to deceive Claimant, which representations were relied upon by Claimant in his decision to invest in the Debtor ... and Claimant has been damaged thereby.... " (Trustee's *Motion to Expunge and Disallow, and/or to Subordinate and Classify Investor Claims*, dated Dec. 16, 1996); Ex. B–9 (Primavera Proof of Claim, dated Jan. 3, 1995); Ex. D–6 (Hubert Looser Proof of Claim, dated Jan. 3, 1995).

wrongdoing by the debtors or the debtors' insiders. Assuming that the debtors are liable under the doctrine of *respondeat superior* for any fraud or other wrong committed by their insiders, I will consider these allegations as amplifying the proofs of claim filed by the plaintiffs in those cases.

## 1. The Primavera Complaint

In its third amended complaint, dated November 8, 1996 ("Third Am. Compl."), Primavera charges federal securities fraud and common law fraud against the Brokers and the debtors' insiders.[5] Primavera did not name the debtors as parties because of the automatic stay, but the complaint includes a section devoted exclusively to their liability, and aptly titled, "Liability of the Granite Funds." The allegations in this section are limited to claims of fraudulent inducement. The section alleges misrepresentations in the "private placement memoranda and other marketing materials" relating to the debtors' investment strategy, (Third Am. Compl. ¶¶ 27–28), the use of sophisticated computer models, (id. at ¶ 29), and the leverage ratios and hedging strategy. (*Id.* at ¶ 30.) Primavera avers that it (and the members of the uncertified class it purports to represent) relied on these misrepresentations, (*id.* at ¶ 32), but does not say how. Nevertheless, the alleged misrepresentations relate to the marketing of the securities, and do not allege any post-investment fraud (other than the failure to perform in accordance with the pre-investment misrepresentations). Accordingly, the part of the complaint that Primavera expressly devoted to an exposition of the debtors' liability alleges only inducement claims.

Parsing the allegations asserted against the debtors' insiders leads to the same conclusion. In the first claim, based on section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b–5 promulgated thereunder,[6] Primavera alleges that the defendants made misrepresentations "to induce the plaintiff and the members of the class to purchase securities issued by the Granite Funds." (Third Am. Compl. at ¶ 117.) Further, "[h]ad the plaintiff and the members of the class known of the material adverse information not disclosed by the defendants', or been aware of the truth, they would not have purchased the Granite Funds securities." (*Id.* at ¶ 121.) These are fraudulent inducement, and not fraudulent retention, claims. Similarly, in its third claim based on common law fraud, Primavera alleges that the debtors' insiders made material misrepresentations with the intent of *inducing* the plaintiffs and members of the class to purchase securities issued by the debtors. (*Id.* at ¶ 132) (emphasis added.) As is apparent from a cursory reading of the Primavera complaint, the allegations against the debtors and their insiders raise pure inducement claims, and hence, must be subordinated pursuant to 510(b).

## 2. The UIC Compliant

This leaves the UIC, whose complaint in *ABF Capital* has already been the subject of a thorough decision by Judge Sweet. The complaint alleges, *inter alia*, that David Askin and Askin Capital Management, L.P. ("ACM"), two of the debtors' insiders,[7] continually issued false statements between September 1991 and March 1994, and that the plaintiffs relied on these false statements in purchasing and *retaining* their interests. *ABF Capital*, 957 F.Supp. at 1315–16. In particular, ACM, aided and abetted by the Brokers, used artificially-inflated performance results in reports sent to the investors. *Id.* at 1316.

The Brokers moved to dismiss the UIC's aiding and abetting claim. In their motion,

---

5. Primavera's second amended complaint, which was the subject of the Granite decision, was dismissed by District Judge Sweet with leave to replead some of the fraud claims. *See Primavera*, 1996 WL 494904, at *22.

6. Primavera could not allege a fraudulent retention claim under section 10(b) of the 1934 Act or Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926–27, 44 L.Ed.2d 539 (1975). I am considering its securities fraud claims only on the possibility that Primavera alleges claims which, although not cognizable as securities fraud claims, may nonetheless state claims for fraudulent retention under state law.

7. ACM was also the debtors' investment advisor.

they sought to separate the fraudulent inducement and fraudulent maintenance claims, and argued that the latter were legally insufficient. Judge Sweet first broke the fraudulent maintenance claims down into two separate components: (1) ongoing misrepresentations of the debtors' performance and (2) concealment of the debtors' investment practices which prevented the plaintiffs from withdrawing their investments. *Id.* at 1328–29. He then assumed, without deciding, that the distinction between the inducement and maintenance claims was a valid one, *id.*, and proceeded to evaluate the motion.

First, Judge Sweet ruled that the misrepresentations regarding the debtors' performance stated a fraudulent maintenance claim. The plaintiffs alleged that the debtors' insiders, aided and abetted by the brokers, passed inflated marks on to the plaintiffs, and in reliance upon the false statements regarding performance, the plaintiffs retained their interests in the debtors. *Id.* Second, the allegations of a continuing concealment of the inducing fraud also stated a fraudulent maintenance claim:

> Moreover, the fraudulent maintenance claim is not predicated exclusively on the existence of post-investment statements, but on ACM's failure to disclose the falsity of the statements that initially induced the Plaintiffs' investments. ACM, which had a direct relationship with the Plaintiffs, clearly has an affirmative duty to disclose such information, and its failure to do so constitutes a primary fraud upon which an aiding and abetting claim can be based. Thus the primary fraudulent maintenance claim is adequately pleaded.

*Id.* The question for this Court is whether 11 U.S.C. § 510(b) mandates the subordination of either or both of the UIC's fraudulent maintenance claims.

## DISCUSSION

### A. Introduction

Any discussion of section 510(b) must begin with the 1973 law review article authored by Professors John J. Slain and Homer Kripke, entitled The *Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L.Rev. 261 (1973) ("Slain & Kripke"). The article reviewed the state of the law, and, focusing on stockholders' rescission claims, opined that they should be subordinated to the payment of unsecured claims. Their conclusion flowed from an analysis based upon the allocation of two different types of risk: (1) the risk of the debtor's insolvency and (2) the risk of illegality in the issuance of the debtor's securities. *Id.* at 286.

According to Professors Slain and Kripke, both investors and creditors accept the risk of enterprise insolvency but to a different degree. *Id.* This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cushion for the repayment of the claim. *Id.* The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected in the absolute priority rule, and should not be reallocated. *Id.* at 286–87.

In contrast, investors alone bear the risk of illegality in the issuance of securities. Moreover, no basis exists to shift any portion to creditors who are not offered the stock. *Id.* at 288. The authors analogized the situation to the principal debtor who defrauds its surety. While the surety has rights against the principal debtor, it may not withdraw from its undertaking, and thereby shift the risk of the principal debtor's fraud to creditors who relied on the undertaking. *Id.* For the same reason, a shareholder's fraud claim cannot be treated equally with the claims of general creditors. This improperly reallocates this risk to the latter class that has' relied on the equity cushion in extending credit to the debtor. *See Id.*[8]

---

**8.** Two months after the publication of the article, the Commission on the Bankruptcy Laws of the

There is a danger in reading Slain & Kripke too restrictively. It is true that the authors' analysis dealt exclusively with claims arising from fraud in the issuance of securities. They did not, however, intend to restrict their opinions regarding subordination to fraudulent issuance claims. Instead, their larger concern was the investor's claim against the issuer *based upon the loss of his investment:*

> We are only incidentally concerned with the precise predicate of a disaffected stockholder's efforts to recapture his investment from the corporation. For present purposes it suffices to say that when the basis of the stockholder's disaffection is either the issuer's failure to comply with registration requirements or the issuer's material misrepresentations, one or more state or federal claims may be made. Our purpose is to consider the impact of such claims on the distribution of the corporation's assets in bankruptcy and the development of a plan of reorganization under Chapter X.

Slain & Kripke at 267.

## B. The Pre–Code Cases

The Slain & Kripke analysis figured in the post–1973 cases decided under the former bankruptcy act. In the seminal case, *In re Stirling Homex Corp.*, 579 F.2d 206 (2d Cir. 1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979), shareholders of the debtor appealed a lower court ruling that had subordinated their federal securities and other fraud claims relating to the acquisition of their interests. The Second Circuit framed the issue as "whether persons who were allegedly induced by fraud to purchase Homex stock should be allowed, in a reorganization proceeding, to assert claims in such a way as to achieve parity with ordinary

unsecured tort and contract claimants." *Id.* at 211.

The Court assumed, for purpose of analysis, that the defrauded stockholders were creditors within the meaning of the Bankruptcy Act. *Id.* at 212. Nevertheless, equitable principles required subordination of their claims. "Where the debtor corporation is insolvent and is about to undergo complete liquidation, the equities favor the conventional general creditors rather than the allegedly defrauded stockholders." *Id.* at 213. Those who extend credit do so in reliance upon the equity cushion provided by the shareholders' investment and the absolute priority rule. *Id.* at 213–14. When the corporation is solvent, the relative priorities between creditors and shareholders are without significance. But

> [w]hen a corporation becomes bankrupt, the temptation to lay aside the garb of a stockholder, on one pretense or another, and to assume the role of a creditor, is very strong, and all attempts of that kind should be viewed with suspicion.

*Id.* at 213 (quoting *Newton Nat'l Bank v. Newbegin*, 74 F. 135, 140 (8th Cir.1896)).

The Court turned for additional support to the Slain & Kripke analysis of risk allocation. Thus, while both creditors and investors assume the risk of insolvency, "only the investors should be forced to bear the risk of illegality in the issuance of the stock." 579 F.2d at 214. The subordination of the defrauded investor flows from the absolute priority rule. It reflects the different degree to which each class assumes the risk of insolvency, as well as the shareholders unique chance to share in the profit that accompanies business prosperity. *Id.* The Court also found newly enacted section 510(b), and its legislative history, to be persuasive. *Id.* at 214–15.

United States (the "Commission") issued its report and proposals. See Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess., Pts. I & II (1973) ("Bankruptcy Commission Report"). Proposed section 4–406(a)(1) subordinated "any claim for rescission of the purchase of securities issued by the debtor corporation or for damages resulting from the purchase or sale of such securities." Bankruptcy Commission Report, Pt. II, at 115. According to the explana-

tory note following the section, the provision was intended to reach claims by holders of the debtor's securities that were based on "federal and state securities legislation, rules pursuant thereto, and similar laws," but would not affect any other claim (*e.g.*, a wage claim) which the investor also held. *Id.* at 116. The report does not explain the reason for the proposal other than that the Commission recommended it, *id.*, Pt. I, at 22, and does not mention the Slain & Kripke article.

Three subsequent Ninth Circuit cases decided under the former Bankruptcy Act relied on the Slain & Kripke risk analysis, the adoption of section 510(b) and the *Stirling* decision in reaching the same conclusion regarding the subordination of defrauded shareholder claims. *See In re Holiday Mart, Inc.*, 715 F.2d 430 (9th Cir.1983); *Falcon Capital Corp. Shareholders v. Osborne (In re THC Fin. Corp.)*, 679 F.2d 784 (9th Cir.1982); *Kelce v. U.S. Fin. Inc. (In re U.S. Fin. Inc.)*, 648 F.2d 515 (9th Cir.1980), *cert denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). *In re THC Fin. Corp.* involved claims of post-investment fraudulent conduct, and merits discussion. There, shareholders of Falcon Capital Corporation ("FCC") became shareholders of The Hawaii Corporation ("THC") through a merger. Under the merger agreement, the FCC shareholders became entitled to 400,000 shares of THC stock in exchange for their FCC stock. They received 100,000 shares immediately; the remaining 300,000 was placed in escrow. Their right to receive the escrowed shares depended on FCC achieving a certain level of earnings. *In re THC Fin. Corp.*, 679 F.2d at 785.

The shareholders never received the additional 300,000 shares. As a result, they filed fraud claims in the subsequent bankruptcy of THC Financial Corporation ("THCF"), THC's wholly-owned subsidiary. The shareholders contended that after the merger, THC and THCF conspired to suppress FCC's earnings and prevent them from receiving their additional shares. *Id.* The shareholders conceded that any claim against THC for fraud in the issuance of the stock would have to be subordinated. *Id.* at 786. They sought to distinguish their fraud claim, characterizing it as one against the issuer's subsidiary for an independent tort. *Id.*

The Ninth Circuit rejected the distinction, concluding that "the policy considerations that led us to subordinate the stockholder's claim in *U.S. Financial* apply with equal force." *Id.* The shareholders in both cases bargained for equity-type profits and equity-type risks when they purchased the stock, including the risk of fraud. *Id.* Without subordination, the THC shareholders would stand in front of the THC creditors in the line for THC's asset, the equity in THCF. *Id.* Further, although the shareholders characterized their claim as one for "interference with contractual relations," "inducement of breach of contract" and/or "conspiracy to defraud", their claim is essentially that of defrauded shareholders, and not victims of an independent tort. *Id.* at 787.

The Court reached this conclusion reasoning that the post merger conduct did not give rise to a separate tort, and related back to THC's fraud in the issuance of the stock. First, the shareholders' amended proof of claim stated that THCF and THC acted pursuant to a *continuing* scheme devised before and executed after the merger. *Id.* at 787 n. 5. Second, the fraudulent misrepresentations of THC and subsequent conduct of THCF did riot create two separate causes of action. *Id.* But even if they did, the absolute priority rule still required subordination of the claims against THCF. *Id.* at 787.

## C. The Bankruptcy Code

In the present matter, the Trustee, Kidder and DLJ seek to subordinate the investors' fraudulent retention claims under section § 10(b). In particular, the parties dispute whether a claim that post-investment fraud induced an investor to hold on to and not sell his investment is a claim "arising from the purchase or sale" of a security of the debtor. As always, "[t]hough we may not end with the words in construing a disputed statute, one certainly begins there." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L.Rev. 527, 535 (1947).

The first principle of statutory construction is that a statute clear and unambiguous on its face should be enforced according to its terms. 2A Norman J. Singer, *Sutherland Statutory Construction* § 45.02, at 5 (5th ed.1992 rev.) (*"Sutherland"*); *see Patterson v. Shumate*, 504 U.S. 753, 759, 112 S.Ct. 2242, 2247, 119 L.Ed.2d 519 (1992) (court must enforce a statute according to its terms); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (plain meaning conclusive except on rare occasions where it produces "a result demonstrably at odds with

the intentions of its drafters") (quoting *Griffin v. Oceanic Contractors, Inc.* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)); *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.),* 920 F.2d 183, 185 (2d Cir.1990) (same). "Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses." 2A *Sutherland* § 45.02, at 6; *accord United States v. Iron Mountain Mines, Inc.,* 812 F.Supp. 1528, 1557 (E.D.Cal.1992). Where ambiguity does exist, a court must attempt to discern the legislature's intent. 2A *Sutherland* § 45.05, at 22–23; *see Patterson v. Shumate,* 504 U.S. at 761, 112 S.Ct. at 2248.

■ Initially, the phrase "arising from the purchase or sale" 'is ambiguous, at least with respect to fraudulent maintenance claims. Something "arises" from a source when it originates from that source. *Webster's New International Dictionary* 117 (unabridged ed.1976); *Black's Law Dictionary* 108 (6th ed.1990). The phrase "arising from" signifies some causal connection. *Cf. Black's Law Dictionary* 108 (defining "arises out of"). A literal reading implies that the injury must flow from the actual purchase or sale; a broader reading suggests that the purchase or sale must be part of the causal link although the injury may flow from a subsequent event. Since the fraudulent maintenance claim cannot exist without the initial purchase, the purchase is a causal link. Reasonably well-informed persons could interpret section 510(b) in either sense, and hence, the section is ambiguous.

The legislative history provides some guidance to its meaning. In enacting section 510(b), Congress ascribed to the Slain & Kripke theory of allocating the risks of insolvency and the unlawful issuance of securities. H. Rep. 95–595, at 195 (1977).[9] The creditor relies on the equity cushion created by the investment, and does not share with ownership the potential benefit of profit. *Id.* Thus, "[t]he bill generally adopts the Slain/Kripke position," and "subordinates in priority of distribution rescission claims to all claims that are senior to the claim or interest on

which the rescission claims are based." *Id.* at 196.

While these statements are helpful, they are not dispositive. Neither Congress, in enacting section 510(b), nor Slain and Kripke limited themselves to rescission claims. As noted, section 510(b) also subordinates claims for damages arising from the purchase or sale of the debtor's securities. Moreover, while Slain and Kripke focused on the unlawful issuance of securities and rescission claims, they were concerned with the broader issue of the "disaffected stockholder's efforts to recapture his investment from the corporation." Slain & Kripke at 267.

### D. Other Federal Statutes

■ In searching for Congress's intent, a court may also look to similar language in unrelated statutes that apply to similar persons, things or relationships. 2B *Sutherland* § 53.03, at 233. The use of similar language strongly indicates that the two statutes should be interpreted *pari passu,* particularly where they share the same raison d'etre. *Northcross v. Board of Educ.,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). In this regard, consideration of the recent RICO amendment, enacted as part the 1995 Private Securities Litigation Reform Act, is appropriate. Section 1964(c) of Title 18, as amended, now provides as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue ... except that no person may rely upon *any conduct that would have been actionable as fraud in the purchase or sale of securities* to establish a violation of section 1962....

(Emphasis added.) The legislative history spells out Congress's purpose in unambiguous terms. It sought to eliminate fraud in the purchase or sale of securities as a predicate act for civil RICO actions (as well as related claims of wire and mail fraud) S.Rep. No. 104–98, 1995 WL 372783, at 39–40 (1995); H.R.Rep. No. 104–369, 1995 WL 709276, at 102–03 (1995); *accord Rowe v. Marietta Corp.,* 955 F.Supp. 836, 844 (W.D.Tenn.1997) (Congress intended to remove, as predicate

---

**9.** The relevant provision in the House bill, H.R. 8200, is proposed section 510(a)(2).

RICO acts, conduct otherwise actionable as fraud in the purchase or sale of securities).

The RICO amendment is highly instructive in construing section 510(b). In *ABF Capital*, the defendants moved to dismiss the UIC's RICO claims, contending that all of the investors' fraud claims (including the fraudulent maintenance claims) were barred by the RICO amendments, *i.e.*, that they were based upon "conduct that would have been actionable as fraud in the purchase or sale of securities." The plaintiff investors conceded that the amendment, if applicable, barred their RICO claims. *ABF Capital*, 957 F.Supp. at 1319–20. Further, Judge Sweet specifically ruled that the bar extended to the fraudulent maintenance claims "since the RICO amendments prohibit the bringing as a RICO claim of any conduct actionable as fraud in the purchase or sale of securities." *Id.*

While conceding that their fraudulent maintenance claims are based on conduct that would be actionable as fraud in the purchase or sale of a security, the UIC nevertheless contend that they do not arise from the purchase and sale of the debtors' securities within the meaning of section 510(b). They offer two reasons for the distinction. First, Judge Sweet's conclusion, they maintain, is "pure dicta." *Supplemental Brief of the Unofficial Investors' Committee Concerning Bankruptcy Code Section 510(b)*, dated Apr. 9, 1997, at 2 ("UIC Supp. Br."). Second, stark differences between the RICO amendment and section 510(b) concerning language, motive and legislative intent mean

they should not be construed in an identical manner. *Id.* at 2–3.

The UIC's first point ignores their own argument. If Judge Sweet's conclusion is dicta, this is only because the UIC *conceded* that the RICO amendments, if applicable, barred all of their claims, and instead, argued that the amendment should not be applied retroactively.[10] But more to the point, the UIC ultimately agrees with Judge Sweet's analysis and his conclusion:

> In short, Congress gave every indication of its intent to eliminate all forms of securities-related fraud—whether related to an "inducement" or a "retention," whether arising under federal securities law or common law—as viable sources of RICO treble damages.

*Id.* at 11; *see also id.* at 8.

This brings us to the UIC's second point: even though the RICO amendment and section 510(b) use similar language, that language should be interpreted differently. No rule of logic or statutory interpretation supports this argument. Conduct which is actionable as fraud gives rise to a claim for damages. Indeed, although the UIC attempts to distinguish the two—RICO proscribes "actionable conduct" while section 510(b) addresses "claims" (*UIC Supp. Br.* at 8)—the UIC rely on the debtors' post-investment fraudulent conduct as the basis for their fraudulent maintenance claims. The conduct and the ensuing claim are the same side of the same coin.

10. It is far from clear that Judge Sweet's ruling regarding the fraudulent maintenance claim is dicta. According to the UIC, the members never asserted that their fraudulent maintenance claim could support RICO liability. *UIC Supp. Br.* at 4. In fact, shortly before Judge Sweet's January 1997 decision, they implied that they held no such claim. When the Trustee objected to the allowance of all of the investors' claims, counsel for the UIC opposed the Trustee's discovery. They argued that the investors' claims were subordinated under section 510(b), and whether they held allowed claims was "relevant only to the investors' ability to pursue the equitable subordination, pursuant to Section 510(c), of other creditors' claims." Letter from Edward S. Weisfelner, Esq. to Hon. Stuart M. Bernstein 3 (Sept.

18, 1996) (annexed to *Reply Memorandum of the Trustee in Further Support of Motion to Expunge and Disallow, and/or to Subordinate and Classify Investor Claims*, dated Jan. 27, 1997, Ex. B)

The UIC's position obviously "evolved," and Judge Sweet considered the fraudulent maintenance claim at some length throughout the *ABF Capital* opinion. Thus, if, as the UIC imply, they limited their concession (regarding the reach of the RICO amendment) to the inducement claim, Judge Sweet had to consider whether the allegations of post-investment fraud described conduct "actionable as fraud in the purchase or sale of securities" before deciding if the RICO amendments also barred the fraudulent maintenance claim. *See Rowe v. Marietta Corp.*, 955 F.Supp. at 844.

The UIC suggests that the more relevant statutory analogy is to section 10(b) of the 1934 Act, and Rule 10b–5 promulgated thereunder. Section 10(b) and Rule 10b–5 proscribe fraud "in connection with" the purchase or sale of securities. The Supreme Court has held that Rule 10b–5 is limited to actual purchasers and sellers, and does not confer rights on a shareholder who decided not to sell due to "an unduly rosy representation or a failure to disclose unfavorable material." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975); *accord Freschi v. Grand Coal Venture*, 551 F.Supp. 1220, 1227 (S.D.N.Y.1982).

The parties have engaged in a lively debate regarding whether "in connection with," as used in section 10(b) and Rule 10b–5, is broader than "arising from," as used in section 510(b). I am not so linguistically adept that I can agree that one is plainly broader than the other, if indeed, they are not actually synonymous. Further, it is not entirely clear that the portion of the UIC's fraudulent maintenance claim based upon a continuing concealment fails to state a claim under section 10(b) and Rule 10b–5. The substance of the concealment claim is that the UIC members held on to their investments because the debtors failed to disclose the inducing fraud. In other words, they retained their securities based upon the same misrepresentations that induced them to make the purchase. Where the same fraud induces both the purchase and the retention of the security, the purchaser may sue under section 10(b) and Rule 10b–5. *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 710 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *Kaufman v. Chase Manhattan Bank, N. A.*, 581 F.Supp. 350, 354 (S.D.N.Y.1984).

■ In any event, the RICO amendment provides the better analogy. Section 510(b) and the RICO amendment are both remedial statutes designed to close loopholes. Section 510(b) prevents a shareholder from converting his interest into a claim and sharing *pari passu* with other unsecured creditors. The RICO amendment was intended to block a securities fraud plaintiff from resorting to RICO and its Draconian remedies. See S.Rep. No. 104–98, 1995 WL 372783, at 39–40; H.R.Rep. No. 104–369, 1995 WL 709276, at 102–03. A court must construe a remedial statute broadly to effectuate Congress' purpose. *See Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (remedial statutes should be liberally construed); *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir.1996) (same).

While Rule 10b–5 was also intended to close a loophole, *Blue Chip Stamps v. Manor*, 421 U.S. at 766, 95 S.Ct. at 1939–40 (Blackmun, J., dissenting), it did this by creating rather than restricting an existing right. Courts should be reluctant to imply a cause of action significantly broader than Congress chose to apply. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 574, 99 S.Ct. 2479, 2488, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) (" [I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it."). In *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), the Second Circuit Court of Appeals reviewed the history of section 10(b) and Rule 10b–5, juxtaposed it against other federal securities laws that created a private right of action, and concluded that they extended only to the actual, defrauded purchaser or seller. *Id.* at 464. The Supreme Court reaffirmed the *Birnbaum* rule in *Blue Chip Stamps*, observing that it barred a claim by one who held on to his shares as a result of fraud. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. at 737–38, 95 S.Ct. at 1926–27. The Supreme Court buttressed its reaffirmation of the *Birnbaum* rule with an extended analysis of the history of section 10(b), Rule 10b–5 and other relevant statutes, and a concern about the effect on securities litigation of expanding section 10(b) and Rule 10b–5 to reach those who neither purchased nor sold. The pedigree and purpose of these antifraud provisions, as well as the effect that a broad interpretation would have on litigation, differs markedly from section 510(b) of the Bankruptcy Code, and justifies a narrower

reading. Accordingly, the interpretation of the "in connection with" language that appears in section 10(b) and Rule 10b–5 does not provide persuasive authority for limiting section 510(b)'s like language in a like manner.

### E. The UIC's Claims

While the two components of the UIC's fraudulent maintenance claims require separate consideration, I conclude that both arise from a purchase or sale of the debtors' securities within the meaning of section 510(b), and must be subordinated. This conclusion not only flows from Judge Sweet's interpretation of similar language in the RICO amendment, but also advances the policy choice that Congress made in enacting section 510(b). Further, a contrary ruling would eviscerate the absolute priority rule, and shift to creditors the investment risk assumed by the UIC.

■ The claim that the debtors continued to conceal their initial, inducing fraud involves the more straightforward analysis, and also disposes of the threshold argument that post-investment conduct cannot give rise to a section 510(b) claim. *See, e.g., In re THC Financial Corp.,* 679 F.2d at 787 n. 5 (subordinating claims arising from a "continuing plan and scheme devised prior to the merger and effectuated subsequent thereto") (decided under the former Bankruptcy Act); *In re Lenco, Inc.,* 116 B.R. 141, 144 (Bankr. E.D.Mo.1990) (subordinating claims "based on the same set of operative facts and based on a continuing plan or scheme."). The charge of continuing concealment cannot exist independent of the initial fraudulent sale, *i.e.,* without fraud in the inducement, there cannot be a wrongful concealment. Further, absent subordination, the UIC can avoid section 510(b)'s mandate simply by ignoring the purchase and claiming that the debtors concealed their prior misrepresentations the day after the sale. In addition, the alleged continuing concealment and ongoing misrepresentations deprived the UIC of the chance to assert their rescission claims. *ABF Capital,*

957 F.Supp. at 1325–26. Since the rescission claims indisputably come within section 510(b), interference with the rescission claims should not create a new and different claim, of greater priority, that shares *pari passu* with the other unsecured creditors.

■ The second component of the fraudulent retention claim arguably raises a more difficult question. The UIC charges that the debtors misrepresented their performance through the use of managers' marks, and issued false operating reports which induced the UIC to hold on to their investments. Unlike the continuing concealment claim, the investor need not assert that he is a defrauded purchaser. Nevertheless, section 510(b) also subordinates this claim. First, from the creditors' point of view, it does not matter whether the investors initially buy or subsequently hold on to their investments as a result of fraud. In either case, the enterprise's balance sheet looks the same, and the creditors continue to rely on the equity cushion of the investment.

Second, a fraudulent retention claim involves a risk that only the investors should shoulder. In essence, the claim involves the wrongful manipulation of the information needed to make an investment decision. The UIC charge that the debtors' wrongfully deprived them of the opportunity to profit from their investment (or minimize their losses) by supplying misinformation which affected their decision to sell. Just as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too. In this regard, there is no good reason to distinguish between allocating the risks of fraud in the purchase of a security and post-investment fraud that adversely affects the ability to sell (or hold) the investment; both are investment risks that the investors have assumed.[11]

Finally, the two cases upon which the UIC rely are distinguishable, and in any event, not persuasive. In In *re Amarex, Inc.,* 78 B.R. 605 (W.D.Okla.1987), *rev'g,* 53 B.R. 888 (Bankr.W.D.Okla.1985), the debtor, Amarex,

---

11. Moreover, the contrary conclusion can lead to an anomalous result. By holding on to their investment in the face of post-investment misinformation, the UIC purport to assert a non-sec-

tion 510(b) claim. If, instead, a member sold his interest to a third party who relied on the same misinformation, the buyer would hold only a subordinated claim.

was a general partner in Amarex Private Drilling Programs, Ltd., 1978 through 1982 (the "Partnerships"), which it operated and through which it conducted much of its business. *Id.* at 606, 609.[12] Approximately 720 limited partners filed proofs of claim in the *Amarex* case [13] charging (1) violations of federal securities laws in connection with the issuance and sale of the Partnership units, and (2) subsequent mismanagement of the Partnerships resulting from breach of contract, breach of fiduciary duty, negligence and common law fraud. *Id.*[14] In addition, thirteen limited partners commenced a class action lawsuit against Amarex's officers, directors and auditors. The plaintiffs alleged federal securities law violations in connection with the issuance and sale of the Partnership units (corresponding to the first type of claim) and common law fraud (corresponding to the second). *Id.* at 607.

The bankruptcy court subordinated all of the claims under 510(b), adopting a "but for" test. The limited partners had asserted that the common law claims should not be subordinated because they were not claims relating to the purchase or sale of a security. The bankruptcy court disagreed, stating that "[t]hese plaintiffs would have no claims against the debtor but for their purchase of the securities, and had the purchase not occurred they would not have the pendent common law claims." *In re Amarex,* 53 B.R. at 891. The bankruptcy court also pointed to the pre-Code case law which explained that the rule underlying what became section 510(b) resulted from the allocation of risk between the shareholders and the creditors. *Id.* at 891. Accordingly, "[i]f the holders

possess their claims because they assumed a risk in seeking a profit those claims are subordinate to claims of persons who sought simple payment of credit extended to the debtor." *Id.*

On appeal, the district court reversed. The limited partners conceded that their federal securities law claims had to be subordinated under section 510(b), but argued that Amarex's post-investment wrongdoing, as operator and general partner of the Partnerships, was not subject to subordination.[15] 78 B.R. at 609. The district court agreed. After considering the Bankruptcy Commission Report and the legislative history to the Bankruptcy Code, the district court concluded that "Section 510(b) reveals a Congressional desire to shift to the shareholders the risk of fraud in the issuance and sale of the security—no more." *Id.* at 609–10. Consequently, section 510(b) does not encompass claims based upon conduct by the issuer of the security that occurred after this event. *Id.* at 610.

The second case, *In re Angeles Corp.,* 177 B.R. 920 (Bankr.C.D.Cal.1995), *aff'd without op.,* 199 B.R. 220 (B.A.P. 9th Cir.1996) is factually similar to *Amarex.* There, the debtor managed sixteen non-debtor limited partnerships, but was not a general partner in any of them. *Id.* at 922. Several limited partners filed claims charging the debtor with acts of mismanagement, misconduct, fraud, breach of fiduciary duty and other wrongful conduct in relation to its management of the partnerships. *Id.* Initially, the court overruled the creditors' committee's objection that, under California law, the limited partners lacked standing to pursue these

---

12. The Partnerships filed their own chapter 11 cases more than one year after the Amarex filing.

13. The claims were filed before the Partnerships filed their own cases.

14. It appears that the limited partners also asserted direct contract claims against Amarex. These relate to Amarex's failure to advance interest payments due on the production and subscription loans of the limited partners and its liability to the limited partners under the various partnership agreements. *Id.* at 606.

15. Neither the bankruptcy court nor the district court discussed why section 510(b) was applicable. The securities at issue—the limited partner-

ship interests—were presumably issued by the Partnerships, not Amarex. Thus, section 510(b) would apply to claims filed in the Amarex case— as these claims clearly were based on the date that they were filed—only if the Partnerships were affiliates of Amarex. This would hold true if Amarex operated the Partnerships' businesses or properties under a lease or operating agreement. 11 U.S.C. § 101(2)(C). The district court decision states that Amarex operated the Partnerships, and this may imply the existence of such agreements, but neither decision discusses the issue or contains any relevant findings.

claims. Although the court acknowledged the general rule that such claims belong to the partnership and not the partners, id. at 925, the court announced an exception that permits one partner to sue another partner guilty of a tort, such as conversion of partnership assets. Id.[16]

The court next addressed the question of subordination under 510(b).[17] Relying on the district court opinion in Amarex, the court held that the claims alleging fraud, mismanagement or breach of fiduciary duty were not claims "arising from the purchase or sale" of the limited partnership interest because they were based on wrongful conduct that occurred subsequent to the purchase of the security. Hence, they could not be subordinated under 510(b). Id. at 926–27.

I do not share the UIC's view that either of these cases is particularly compelling. First, neither court had the benefit of Judge Sweet's analysis of the 1995 RICO amendment or its application to the very complaint now before me. Second, I disagree with Amarex to the extent it implies, and a fortiori, with Angeles which holds, that a derivative injury to an entity can give rise to an investor's claim that is not subject to subordination under section 510(b).[18] Claims of mismanagement, waste and breach of fiduciary duty describe conduct which harms an entity directly, and its investors and creditors derivatively. Granite, 194 B.R. at 327–28. The investors and creditors suffer an indirect injury because the wrongful conduct erodes the entity's assets, making it less likely that it will be able to pay creditors and distribute profits to investors.

This is simply another way of describing insolvency. Yet under the absolute priority rule, the creditors stand ahead of the investors on the receiving line; the enterprise cannot distribute profits until it satisfies its creditors' claims. Twenty years ago, in Stirling Homex, 579 F.2d at 213, the Second Circuit counseled suspicion—with good reason—whenever an investor in an insolvent entity attempts to step up to the level of creditor. When an investor seeks pari passu treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a contrary principle that threatens to swallow up this fundamental rule of bankruptcy law. In this case, he also disregards the purposes of section 510(b).

## CONCLUSION

The Trustee's motion to subordinate the investors' fraudulent inducement and fraudulent retention claims is granted. The parties shall contact chambers to schedule a conference to discuss any remaining issues raised

**16.** The courts conclusion appears to be incorrect. In support of the exception to the general rule, the court cited two general partnership cases, Prince v. Harting, 177 Cal.App.2d 720, 735–36, 2 Cal.Rptr. 545, 554–55 (Cal.Dist.Ct.App.1960) and Laughlin v. Haberfelde, 72 Cal.App.2d 780, 788–89, 165 P.2d 544 (Cal.Dist.Ct.App.1946). Under section 21 of the Uniform Partnership Act, in effect in California since 1929, one general partner can compel another to account for wrongful conduct. The exception to the general rule is not quite what the bankruptcy court stated it to be. Rather, as the cited authorities explain, California permits a general partner to sue another at law, for conversion or breach of fiduciary duty, without first compelling an accounting. Accord Cobin v. Rice, 823 F.Supp. 1419, 1428 (N.D.Ind. 1993) (discussing California law).

The exception had nothing to do with the matter before the Angeles court. The claimants were limited partners in limited partnerships. Under California law, any action for mismanagement of the partnership or breach of fiduciary duty by a third party must be brought directly by the part-

nership, or derivatively by the limited partners. See Cal. Corp.Code § 15702 (West 1997).

**17.** The Angeles decision does not explain why section 510(b) might be applicable to the limited partners' claims against the debtor. As with the Amarex case, the affiliated status may arise from an agreement between the debtor and the partnerships under which the debtor operated their businesses or properties.

**18.** In addition, the Amarex district court apparently read section 510(b) as limited to the "issuance and sale" of the security. The statute does not contain any such restriction, and is not limited to issuance-related claims. In re Lenco, Inc., 116 B.R. 141, 144 (Bankr.E.D.Mo.1990). One who buys an outstanding share of stock on the open market from a third party, based upon false statements uttered by the issuer, holds a subordinated federal securities fraud claim in the issuer's bankruptcy. Although the investor never deals with the issuer, and does not allege fraud in connection with the issuance of the security, his claim would nonetheless fall within section 510(b).

by the Trustee's motion, and their disposition.

SO ORDERED.