**In re KAISER GROUP INTERNATIONAL, INC., et al., Debtors.**

**Nos. 00–2263(MFW) to 00–2301(MFW).**

United States Bankruptcy Court,
D. Delaware.

April 11, 2001.

Norman L. Pernick, Mark Minuti, J. Kate Stickles, Saul Ewing Remick & Saul,

LLP, Wilmington, DE, G. Christopher Meyer, Lynn Rowe Larson, Christine Murphy Pierpont, Squires Sanders & Dempsey, LLP, Cleveland, OH, for Kaiser Group International, Inc., et al.

J. Dennis Faucher, Michael S. Tarringer, Miller Faucher & Cafferty, LLP, Philadelphia, PA, for James D. Pippin, Paul F. Smith and Edgar T. Randol.

Joel A. Waite, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, Richard Havel, Kevin Lantry, Sidley & Austin, Los Angeles, CA, for Official Committee of Unsecured Creditors.

Frank Perch, Office of U.S. Trustee, Philadelphia, PA.

### OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the objection of Kaiser Group International, Inc. ("Kaiser") and certain of its direct and indirect subsidiaries (collectively "the Debtors") to the claims of James D. Pippin, Paul F. Smith, Edgar T. Randol and other former shareholders of ICT Spectrum Constructors, Inc. (collectively "the ICT Shareholders"). The Debtors' objection seeks to subordinate the ICT Shareholders' claims pursuant to section 510(b) of the Bankruptcy Code.

### I. FACTUAL BACKGROUND

On March 17, 1998, ICT Spectrum Constructors, Inc. ("ICT") merged into a subsidiary of Kaiser under an Agreement and

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

Plan of Merger dated February 5, 1998 ("the Merger Agreement"). Pursuant to the Merger Agreement, the ICT Shareholders received 1.5 million restricted shares of Kaiser common stock. According to the Merger Agreement, if the Kaiser stock did not have a value of $5.36 per share on March 1, 2001 ("the Merger Value"), Kaiser was required to pay the difference in value by (a) issuing additional shares or (b) paying cash. (Merger Agreement at § 2.13.) Further, although the Kaiser shares held by the ICT Shareholders were restricted (i.e., they could not be freely sold), the Merger Agreement provided that if the share price went above the Merger Value before March 1, 2001, the ICT Shareholders had the right to require the Debtors to either buy the stock or arrange for the sale of the stock. (*Id.* at § 2.14.)

On March 24, 1999, James Pippin filed suit in federal court in Idaho against Kaiser, its subsidiary and certain Kaiser officers alleging violation of the federal securities laws with respect to the ICT merger. A motion for class certification was filed in that action. A Second Amended Complaint was filed on May 15, 2000, alleging that the ICT Shareholders were fraudulently induced into agreeing to the Merger Agreement.

The Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code on June 9, 2000. Their Second Amended Plan of Reorganization was confirmed by Order dated December 5, 2000.

The ICT Shareholders filed proofs of claim asserting damages arising from the ICT merger, including violations of securities laws, breach of contract, enforcement of the provisions of the Merger Agreement, and other claims arising under the Amended Complaint. The Debtors objected to the ICT Shareholders' claims asserting that all their claims must be subordinated under section 510(b). At the hearing held on March 16, 2001, the parties agreed that the facts are not in dispute and presented oral argument on the legal issue.

## II. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (O).

## III. DISCUSSION

### A. ADR Procedures

The ICT Shareholders preliminarily assert that the matter should be referred to the alternative dispute resolution procedures incorporated into the Debtors' Plan. They assert that by doing so the claims may be settled and the issues moot. The Debtors argue, however, that the legal issue upon which the Debtors' objection is premised should be decided before the parties proceed to mediation since it will focus the parties on what is legitimately in dispute. We agree with the Debtors.

### B. Section 510(b)

■■■ The Debtors assert that section 510(b) mandates subordination of the ICT Shareholders' claims.[2] Section 510(b) provides:

---

**2.** "The task of resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). *See also Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("In interpreting a statute a court should always turn first to one cardinal canon before all others. . . . Courts must presume that a legislature says in a statute what it means and means in a statute what it says there").

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b).

The Debtors assert that the ICT Shareholders' claims are "for damages arising out of the purchase or sale of a security of the debtor" based on the allegations contained in the Pippin lawsuit. Therefore, the Debtors assert those claims must be subordinated under the plain language of section 510(b).

The ICT Shareholders assert that their claims are not for damages relating to the issuance of stock in the Debtors. Instead, they assert claims for breach of the Debtors' contractual obligation to pay cash or issue additional shares to assure the ICT Shareholders the full Merger Value as of March 1, 2001. However, these same arguments have been made to, and rejected by, many courts. *See, e.g., American Broadcast Syst., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir.2001) (claim for breach of contract to issue shares in debtor after audit was subordinated as damages relating to sale of security of debtor); *In re NAL Fin. Group, Inc.*, 237 B.R. 225, 230 (Bankr. S.D.Fla.1999) (breach of contract claim for

debtor's failure to register debentures as required by securities purchase agreement was subordinated under § 510(b)); *In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr.S.D.N.Y.1997) (claims for fraudulent inducement and violations of securities acts were subordinated under § 510(b)).

The ICT Shareholders seek to distinguish those cases, and our opinion in *In re International Wireless Communications Holdings, Inc.*, 257 B.R. 739 (Bankr.D.Del. 2001), by arguing that in this case the Merger Agreement required that the Debtors pay the difference between the Merger Value and the price of their stock in cash.[3] However, we do not find this distinction significant. The obligation to pay the Merger Value was an obligation undertaken by the Debtors in connection with the issuance of their stock and as a guarantee by the Debtors of the value of their stock. This is clearly a claim based on damages resulting from the sale or purchase of securities of the Debtors.

Further, while the ICT Shareholders attempt to recharacterize their claim in this Court to avoid the application of section 510(b), it is clear from the allegations in the Amended Complaint filed in the Idaho District Court that the basis of their claims is the allegation that the Debtors committed securities fraud and made material misrepresentations to the ICT Shareholders to induce them to enter into the Merger Agreement. Such allegations place their claims squarely within the purview of section 510(b).

Nor do we accept the ICT Shareholders' argument that their claims are similar to the claims in *In re Motels of America, Inc.*, 146 B.R. 542 (Bankr.D.Del.1992). In

---

**3.** Although the Merger Agreement gives the Debtors the option to pay the difference in stock or cash, the ICT Shareholders argue that there was a cap on the amount of stock that could be issued. Because the current value of the Debtors' stock is negligible, the ICT Shareholders state that the Debtors would have to make up the difference almost entirely in cash. (*See* Merger Agreement at § 2.15.)

*Motels of America,* the Court concluded that the claim of a former employee and shareholder for breach of a contract to pay for its stock was not subordinated under section 510(b). This case is distinguishable from that case because in *Motels of America* the agreement at issue had divested the claimant of "all of the indicia of ownership." 146 B.R. at 543. Those benefits had been transferred to the debtor who had agreed to pay the claimant over a specified period of time. The Court concluded that the claim for breach of that agreement was not subordinated by section 510(b) since the claimant was not a shareholder at that time. *Id.* The ICT Shareholders assert that their claims are similar because the stock issued to them was restricted.[4] Consequently, they assert that they were more like general creditors rather than shareholders.

The ICT Shareholders also cite as support the case of *Montgomery Ward Holding Corp v. Schoeberl (In re Montgomery Ward Holding Corp.),* slip op., Bankr.No. 97–1409, Adv. No. 99–560 (Bankr.D.Del. Jan. 16, 2001). In *Montgomery Ward,* Judge Walsh held that section 510(b) was not applicable to a claim based on the debtor's default of a promissory note issued in partial payment for stock redeemed from the claimant. *Montgomery Ward,* slip op. at 8–17. The Court concluded that the claim was not one for damages resulting from the purchase or sale of the debtor's stock. Instead, the claim arose as a result of the debtor's failure to pay on the note. *Id.* at 12. In *Montgomery Ward,* as in *Motels of America,* the claim did not arise when the claimant was a shareholder and as a result of his status as a shareholder, but after the claimant had divested himself of all indicia of share ownership. When the claim arose, the claimant had only the expectation of a fixed recovery and had no expectation of sharing in the profits of the business or in suffering the consequences if the business were not successful. Therefore, at the time the claim arose, the claimant was a creditor, not a shareholder.

Unlike the claimants in *Motels of America* and *Montgomery Ward,* the ICT Shareholders did not, at any time, divest themselves of any of their rights as shareholders. Nor is the Merger Agreement in any sense of the word a "debt" instrument. In *Montgomery Ward,* the claimants held a note which is clearly a debt instrument, and in *Motels of America,* the employee had transferred his stock to an escrow account in favor of the debtor and only had rights under a contract which required the debtor to pay him a set sum. We cannot agree that the ICT Shareholders, who always held stock rather than a debt instrument, are more like the creditors in *Motels of America* and *Montgomery Ward* than shareholders.

In *Granite Partners,* the Court held that the fundamental inquiry in determining whether section 510(b) is applicable to a securities-related transaction is the nature of the claim. 208 B.R. at 338. The Court considered the difference in treatment of creditors and interest holders under the Bankruptcy Code in the context of their expectations:

> [B]oth investors and creditors accept the risk of enterprise insolvency but to a different degree.... This stems from their dissimilar expectations. Even if the business prospers, the creditor anticipates no more than the repayment of his fixed debt. Further, the shareholder's investment provides an equity cush-

---

4. Under the terms of the Merger Agreement, the ICT Shareholders could not sell the Kaiser stock until the earlier of March 1, 2001, or the date the stock price reached the Merger Value. (Merger Agreement at § 2.14.)

ion for the repayment of the claim.... The investors, on the other hand, share the profits to the exclusion of the creditors. The shareholder's enhanced risk of insolvency represents the flipside of his unique right to participate in the profits. The allocation of the risk, as between the investor and the creditor, is reflected by the absolute priority rule, and should not be reallocated.

*Id.* at 336 (citations omitted).

Unlike *Motels of America* and *Montgomery Ward*, the ICT Shareholders hold stock in Kaiser, not debt instruments. At all times the ICT Shareholders retained the fundamental rights (and expectations) of shareholders. The ICT Shareholders always retained the most important aspect of ownership: the right to share in any profits of the Debtors or increase in their enterprise value (through appreciation in the value of the stock).

Although the stock held by the ICT Shareholders was restricted, it was only restricted for a certain period of time. Even during the restricted period, the ICT Shareholders retained the "upside" in any value of the Debtors' stock. The Merger Agreement provided that if the stock price went above the Merger Value during the restricted period, the ICT Shareholders could require that the Debtors buy the stock from them or arrange its sale. Thus, they retained their essential rights and expectations as shareholders at all times. Therefore, we hold that statutory subordination under section 510(b) is mandated.

### IV. *CONCLUSION*

For the foregoing reasons, we conclude that the claims of the ICT Shareholders are for damages arising from the purchase of stock of the Debtors. Consequently, they are subordinated to the claims of creditors pursuant to section 510(b).

An appropriate Order is attached.

### *ORDER*

AND NOW, this **11TH** day of **APRIL, 2001,** upon consideration of the Debtors' objection to the claim of James D. Pippin, Paul F. Smith, Edgar T. Randol and other former shareholders of ICT Spectrum Constructors, Inc., set forth in the Fifth Omnibus Objection to Claims, it is hereby

**ORDERED** that the objection is **SUSTAINED;** and it is further

**ORDERED** that the claims of the ICT Shareholders are subordinated to the claims of creditors pursuant to section 510(b).